SANTANA, INC., Successor to Soft-Fade Apparel Processors, Inc., t/d/b/a Soft-Fab Textile Processors, Appellee,

v.

**LEVI STRAUSS AND COMPANY, Appellant.**

SANTANA, INC., Successor to Soft-Fade Apparel Processors, Inc., t/d/b/a Soft-Fab Textile Processors, Appellant,

v.

**LEVI STRAUSS AND COMPANY, Appellee.**

Nos. 80–1884(L), 80–1886.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 9, 1981.

Decided March 23, 1982.

Robert W. Spearman, J. Allen Adams, Raleigh, N. C. (Nancy Bentson Essex, Sanford, Adams, McCullough & Beard, Raleigh, N. C., on brief), for Levi Strauss and Co.

Before HALL, ERVIN and CHAPMAN, Circuit Judges.

CHAPMAN, Circuit Judge:

This appeal from the Western District of North Carolina involves three separate causes of action: a claim for breach of contract, a fraud claim, and an unfair trade practice claim under N.C.G.S. § 75–1.1. The jury returned verdicts for the plaintiff Santana, Inc. in the amount of $76,122.37 on the contract claim, $203,910 on the fraud claim and $50,000 on the statutory unfair trade practices claim. Defendant Levi Strauss and Co. moved for judgment notwithstanding the verdict on each cause of action. After argument on the motion the district court entered j. n. o. v. on the fraud claim and judgment in accordance with the verdict on the other claims. In addition, the $50,000 unfair trade practice award was trebled pursuant to N.C.G.S. § 75.16, leaving Santana with a total recovery of $226,122.37.

Santana appeals the granting of j. n. o. v. on the fraud claim. Levi Strauss cross appeals the denial of j. n. o. v. on the remaining causes of action. We affirm in part and reverse in part.

Santana is a Missouri corporation, with its home office in St. Louis and an office in Greensboro, North Carolina, engaged in the business of laundering fabric to give it a worn effect. Levi Strauss is a Delaware corporation, with its home office in San Francisco, California, engaged in the business of manufacture and sale of garments, particularly those made of denim.

In February 1977, the parties entered into a contract whereby Levi agreed to provide and Santana agreed to process 148,-400 yards of first quality Burlington heavyweight denim. The processed fabric was to be used in Levi's "prewashed" bluejeans. Levi shipped 123,929 yards of the denim to Santana. The remaining fabric, 24,471 yards, was sent to Santana directly from Burlington.

The actual processing of the fabric was performed in North Carolina by Santana's subcontractor, Sayles Biltmore Bleacheries, which began shipping processed rolls of denim to Levi Strauss on March 25, 1977. The first shipment was rejected by Levi Strauss due to "high warp shrinkage." During the spring of 1977, Levi rejected additional lots of denim processed by Sayles. Samples of each of these lots were sent to Santana. Santana twice attempted to reprocess the rejected denim without success.

In February 1978, Levi sent Santana an invoice for $301,333.72 for the damaged denim. Settlement negotiations began shortly thereafter. During the time that the settlement was being negotiated, Santana tested portions of the processed fabric as well as some unprocessed fabric which it had retained. As a result of this testing, Santana's president, Michael Novoson, wrote to Levi on July 27, 1978, indicating that preliminary testing reports "vividly point to the fact that L.S. & Co. is not blameless in this matter." Indeed, the record shows that in April 1978 Santana pos-

sessed at least two reports on which it relied at trial to show that the fabric was not first quality. The letter suggested a settlement figure of $204,000. In order to pay the $204,000, Novoson urged Levi to increase its garment laundry business with Santana to 200,000 garments per month. When billed for the laundry services, Levi would deduct ten percent from the invoice charges until the total deductions reached $204,000. Though never reduced to writing, the agreement was accepted and executed. Santana performed its laundering obligations under the agreement through a subcontract with Sunshine Laundry in San Antonio, Texas.

While the agreement was being carried out, the parties attempted to put its terms in writing. In one proposal submitted to Santana, Levi stated that the fabric supplied was first quality. Santana responded with its own version of the agreement which excluded this language.

In August 1978, Santana's fiscal year ended with net profits from the garment laundering business of $154,527. In a letter dated July 29, 1978, Novoson projected that Santana's net income for the fiscal year ending August 31, 1979 would be well under $144,000. As a result of the increased laundering business stemming from the settlement agreement, Santana's net income in 1979 from garment laundering was $304,708 even after deduction of the $204,000 in invoice credits.

This appeal presents an initial question of choice of law. This court is bound to follow the choice of law rule of North Carolina, the forum state. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1937). In personal injury and wrongful death cases, North Carolina courts have unequivocally adhered to the *lex loci deliciti* rule. In determining the place of the tort, North Carolina courts apply the generally accepted interpretation of the *lex loci* rule that the tort is deemed to have occurred where the last event takes place, that is necessary to render the actor

liable. Injury being the last element of a tort, North Carolina rule, in a nutshell, is the law of the place of injury. *Shaw v. Lee,* 258 N.C. 609, 129 S.E.2d 288 (1963); *Farmer v. Ferris,* 260 N.C. 619, 133 S.E.2d 492 (1963), *Petrea v. Ryder Tank Lines, Inc.,* 264 N.C. 230, 141 S.E.2d 278 (1965).

Though the choice of law rule for personal injury actions is clear, the North Carolina Supreme Court has never had the opportunity to address the question of what law applies in multi-state misrepresentation or unfair trade practice cases. In *Lowe's North Wilkesboro Hardware v. Fidelity Life Ins. Co.,* 319 F.2d 469 (1963), we were faced with a situation not clearly governed by any of North Carolina's traditional choice of law rules. In determining that North Carolina would apply the "most significant relationship" test to a case involving allegations of negligent delay in acting upon an application for life insurance in a multi-state setting, we concluded:

[W]e find it most reasonable, in these circumstances, to avoid a rigid rule and to pursue instead a more flexible approach which would allow the court in each case to inquire which state has the most significant relationships with the events constituting the alleged tort and with the parties. The relative weight due particular factors will vary from case to case, and the court must judge the totality of contacts of the states concerned with the parties and the subject matter. Having thus determined which state has the most significant relationships, the court then will apply the law of that jurisdiction.

In *Brendle v. General Tire and Rubber Co.,* 408 F.2d 116 (1969), we were asked to apply the reasoning in *Lowe's* to a wrongful death action against an Ohio tire manufacturer. A North Carolina domiciliary was killed in an accident in Missouri caused by a defective tire manufactured in Ohio and sold in North Carolina. We rejected plaintiff's argument that the "most significant relationship" test was applicable and applied the law of Missouri, the place of injury. The *Brendle* court distinguished *Lowe's* by stating:

In *Lowe's*, we were presented with a factual situation and a legal question never faced by the North Carolina court, and we could conclude that it would have decided the case as we indicated, adopting a flexible approach in order to deal adequately with the special multi-state features of that case. Here, however, the North Carolina decisions clearly reveal the unqualified adherence of the North Carolina Supreme Court to the *lex loci* rule in cases involving personal injury or wrongful death, without regard to whether the accident involved a breach of local traffic rules.

A decision of the North Carolina Court of Appeals also suggests a flexible approach to cases other than personal injury and wrongful death cases. That court applied the law of California to a case involving tortious disclosure of trade secrets obtained during employment in California. The existence of a duty in tort is determined by the law of the state in which the relationship giving rise to that duty was created. *Travenol Labs v. Turner*, 30 N.C.App. 686, 228 S.E.2d 478 (1976). We find it unnecessary to decide which approach the North Carolina Supreme Court would follow in the present case as both lead to the same conclusion.

The application of the traditional rule of *lex loci* would require us to determine the place of injury and apply its law. The injury alleged is $204,000 in invoice deductions made by Levi. The deductions were made by Levi in California and constituted the last act necessary to render the actor liable. The law of California would, therefore, apply under the traditional rule.

The "most significant relationship test" requires the court to examine various factors to determine which state has the most significant relationship to the occurrence giving rise to the suit. The law of the state with the most significant relationship is then applied. Restatement (Second) Conflict of Laws § 148 (1971) outlines factors to be considered in cases such as this.

(2) When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false represen-

tations were made, the forum will consider such of the following contacts, among others, as may be present in the particular case in determining the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties:

(a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,

(b) the place where the plaintiff received the representations,

(c) the place where the defendant made the representations,

(d) the domicil, residence, nationality, place of incorporation and place of business of the parties,

(e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

(f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Analysis of these factors provides little guidance in the present case. Santana acted in reliance on Levi's representation in Texas. The representations were received in California, Missouri, and North Carolina. The representations were made from California. Santana's place of incorporation is Missouri, Levi's is Delaware. Levi's headquarters are in California, Santana's are in Missouri, but it maintains an office in North Carolina. The subject of the transaction between the parties moved around during the settlement negotiations. At times the denim was in North Carolina and at other times in Alabama. The location of the subject matter during the critical time is not clear. Location is not, however, a significant factor in the present case. The place where Santana rendered performance is again Texas. Analysis of these factors does not lead to the choice of the law of any one particular jurisdiction.

This court in applying the "most significant relationship" test to the facts in *Lowe's* gave greatest weight to the location of the relationship between the parties.

This is also the approach taken by the North Carolina Court of Appeals in *Travenol Labs*. These two cases require us to examine where the relationship between the parties was created and where it is centered.

■ The original contractual relationship involving processing of the denim was entered into in California. Efforts to settle the dispute, during which the alleged misrepresentations were initially made, took place at meetings in California. The contacts with Texas and North Carolina were incidental to the original agreements since Santana merely subcontracted with facilities in those states to perform its contracts with Levi. Though Missouri, North Carolina, and Texas had some contact with the facts and parties of this case, on balance, we find California to be the state where the relationship was created and where it was centered. California is, therefore, the state with the "most significant relationship" to the dispute. Having found California law applicable to the tort actions in the present case, we will now apply it to the facts of these two claims.

### FRAUD

■ The elements of fraud in California are:

> (1) that the defendant make a false representation, (2) that defendant had knowledge of the falsity, (3) that defendant intended to induce reliance, (4) that plaintiff actually and reasonably relied, and (5) that plaintiff suffered actual damages. [Citations omitted].

*Crocker-Citizens Nat. Bank v. Control Metals Corp.*, 566 F.2d 631 (9th Cir. 1977). The district court, applying North Carolina law, found that fraud had not been proven because there was insufficient evidence of the defendant's knowledge of the false statement. Since the elements of fraud in North Carolina and California are identical, we see no need to remand the case for consideration under California law.

The question of whether Levi's representation of fabric quality was false was decided by the jury. In answer to a special interrogatory, the jury stated that the denim supplied by Levi was not first quality. Though evidence that the fabric was first quality may have been erroneously excluded at trial, we will treat Levi's representation as false for the sake of this discussion.

■ The district court found that Levi had reasonably relied on representations of fabric quality in invoices from its supplier, Burlington, and that Levi had done random sampling of fabric it received from Burlington which showed first quality. Based on these facts, the court concluded that Levi had a good faith belief that the fabric was first quality. We agree, especially in light of the inability of plaintiff's own experts to agree on the issue of fabric quality. Lack of Levi's knowledge of the falsity of its representation is not, however, the only element of fraud, proof of which we find wanting in this case.

Santana has failed to establish that it reasonably relied on Levi's representation. A party may not claim that it relied on another's misrepresentation when it had knowledge of the falsity of that representation prior to the alleged reliance. Nor may it claim that such reliance is reasonable where it has reason to believe the representation is false.

Prior to the time that the settlement agreement was implemented through garment laundry invoice deductions, Santana had reports of experts on which it relied heavily at trial. These reports, based on tests of processed and unprocessed fabric, indicated that the denim supplied was less than first quality. Santana's recognition of this fact is evinced by the letter from its president to Levi, which stated: "Varley's preliminary report and July 10 letter vividly point to the fact that L.S. & Co. is not blameless in this matter." Additional proof of Santana's belief that Levi's representation of fabric quality is found in Santana's refusal to use the term "first quality" in the proposed written settlements. Santana may not now claim that it relied on Levi's representation when it had reason to, and in fact did, question its reliability. If Santana

relied on Levi's representation, it was not reasonable to do so.

The final element of fraud is damage. Santana contends that it was damaged in the amount of $204,000, when Levi fraudulently induced it to settle claims arising out of their fabric processing contract.

As a direct result of the settlement agreement, Santana increased its net income by over $150,000 and almost doubled its president's salary. In short, far from damaging Santana, the settlement agreement benefited it greatly. We, therefore, affirm the district court's granting of j. n. o. v.

## UNFAIR TRADE PRACTICES

■ Since we have determined that North Carolina law is not applicable to this case, we reverse the district court's refusal to grant j. n. o. v. on the claim based on N.C.G.S. § 75–1.1, without prejudice to a future suit based on a similar California law.[1]

## CONTRACT

■ In order to maintain an action for breach of contract, a plaintiff must show that the alleged breach caused him injury. Again assuming that the fabric supplied by Levi was less than first quality, and that Levi is, therefore, in breach, we can find no damage. As stated above, as a direct result of the settlement agreement Santana boosted its profits nearly 100 percent from the previous year. Santana has, therefore, benefited from Levi's breach and the subsequent settlement agreement.

■ Moreover, at trial Santana argued that the agreement which it entered to resolve the contract claim was procured by fraud and, therefore, invalid. Having found that no fraud exists, we must con-

sider the settlement agreement binding on both parties. Accordingly, the right to pursue the contract claim has been waived by Santana's execution of and retention of benefit under a valid settlement agreement.

■ The jury made a somewhat troublesome finding that the parties had not entered a settlement agreement. As stated above, however, the parties did enter and carry out an agreement to settle their contract dispute. This is quite clear from the correspondence of the parties during negotiations and their actions in executing the garment laundering agreement. Both parties constantly refer to the agreement as a settlement.

Levi argued the settlement as a defense to the breach of contract claim. Santana argued that the agreement was no defense, since it was procured by fraud. The following interrogatories were submitted to the jury:

2. Did the plaintiff and the defendant enter into a settlement agreement as alleged by the defendant in its answer? Answer: No.

3. If so, was the settlement agreement induced by fraud on the part of the defendant as alleged by the plaintiff? Answer: _____.

4. What damages, if any, is Santana entitled to recover on account of the fraudulent procurement of the settlement agreement? Answer: $203,910.00.

The jury's responses are inconsistent not only with each other but with the facts as presented by both parties. It finds damages for fraud in the inducement of a nonexistent agreement. In light of this inconsistency, the apparent agreement of the parties that a settlement existed, and the overwhelming evidence of its existence, we

1. Santana initially engaged three experts to examine the processed fabric. Two of these experts determined that the fabric was not first quality when supplied. The third, Otto Manly, concluded that defects in the denim were caused by Santana's processing. Manly died prior to trial and the district court sustained Santana's objection to introduction of his re-

port as hearsay. The report could have been properly admitted as an admission under Rule 801(d)(2)(C) of the Federal Rules of Evidence. This reasoning was not, however, advanced at trial. We do not see Levi's failure to make this argument below as a barrier to introduction of the report in a subsequent proceeding under California law.

find it appropriate to disregard the jury's finding in holding that Santana waived its contractual claims by entering, executing and benefiting from the settlement agreement. For this reason and because we can find no damages, we reverse the district court's denial of j. n. o. v. on the contract claim.

AFFIRMED IN PART.

REVERSED IN PART.

K. K. HALL, Circuit Judge, dissenting:

The majority holds that although the district court erred in several respects, it is not necessary to have a new trial in this case because Santana could not prevail on any of its claims. Contrary to my brethren, I believe that Santana may have meritorious claims and therefore I would remand the case for a new trial.

As I view the facts,[1] the majority simply does not reach a legal or an equitable result. Levi breached its original contract with Santana by failing to provide first quality fabric to be laundered,[2] and then maneuvered Santana into a settlement agreement in which Levi received approximately $204,000 worth of laundering services at no cost.[3] The jury heard the evidence in this case and awarded damages on all counts, yet the majority would deny Santana any recovery at all.

The errors at trial do not justify an outright reversal. There is no question that the judge gave the jury an incomplete set of interrogatories, which invited inconsistent answers. However, this error does not reflect on the merits of Santana's claims. The evidence shows, at minimum, that Levi's actions constituted unfair and deceptive practices.[4] Although the evidence may not support a claim of actual fraud, Levi's misrepresentations, along with whatever misconceptions were shared by the parties, could vitiate the settlement agreement. The status of the settlement agreement, therefore, rests on factual determinations which should be presented to a jury and retrial is necessary for clear answers.

During the hearings on the post-trial motions, the judge recognized that the trial was severely flawed. His rulings reflect an attempt to make Santana whole without

---

1. The evidence, of course, must be considered in the light most favorable to Santana, the party which secured the jury verdict.

2. The first interrogatory to the jury was answered:

   "Did the Defendant, Levi Strauss and Company breach its contract with the Plaintiff, Santana by failing to provide first quality denim as alleged in the Complaint?
   Answer: Yes
   The trial judge denied Levi's motion for judgment n. o. v. on this issue.

3. I disagree with the majority's statement that Santana's profits from the settlement agreement somehow made up for its losses due to Levi's breach of the original contract. Similarly, even though Santana made record profits as a result of the settlement agreement, Levi received $204,000 worth of laundering at Santana's expense. An important consideration is that when the settlement agreement was proposed, Santana believed that it was responsible for the damage to the fabric. Thus, the settlement was designed to make Levi whole. The party which was actually harmed, however, was *Santana*, not Levi. The majority result nevertheless forces Santana to absorb the cost of replacing fabric which it did not damage.

4. The jury answered the following set of interrogatories on this issue:
   "8. After rejecting the fabric did the defendant misrepresent to the plaintiff:
   (a) That the original fabric was first quality denim?
   Answer: Yes
   (b) That it had tested and inspected the original fabric before it was sent to the plaintiff?
   Answer: Yes
   (c) That the defendant had documents proving that the original fabric was first quality denim?
   Answer: Yes
   9. If so, were such representations false and material and did the defendant know they were false, or were they made in reckless disregard of their truth; were they made with fraudulent intent and did the plaintiff rely on them and act upon them to its injury?
   Answer: Yes
   The trial judge denied Levi's motion for judgment n. o. v., finding that even though Levi's conduct may not have risen to the level of fraud, the jury's answers on the fraud issue indicated that Santana had at least proven the unfair practices claim and the evidence supported that portion of the verdict.

conducting a new trial. I feel certain that if he had suspected that this Court would refuse to give Santana any relief, he would have ordered a new trial himself.