99 F.3d 86
 1997 A.M.C. 98
 CARBOTRADE S.p.A., on its own behalf and as assignee of
Essex Cement Company, Plaintiff-Appellant,
v.
BUREAU VERITAS, Defendant-Third-Party Plaintiff-Appellee,
v.
TITAN CEMENT CO., S.A., Third-Party Defendant.
 No. 1601, Docket 95-9155.
 United States Court of Appeals,
Second Circuit.
 Argued May 28, 1996.
Decided Oct. 31, 1996.
 
 Thomas L. Tisdale, New York City (Patrick F. Lennon, Christopher M. Hanrahan, Tisdale & Associates, New York City, on the brief), for Plaintiff-Appellant.
 Christopher B. Kende, New York City (Bradley F. Gandrup, Jr., Wise & Shepard, LLP, New York City, on the brief), for Defendant-Third-Party Plaintiff-Appellee.
 (Kenneth E. Gordon, Gordon & Gordon, P.C., New York City, on the brief), for Amicus Curiae International Association of Classification Societies.
 Before: VAN GRAAFEILAND, WALKER, and LEVAL, Circuit Judges.
 WALKER, Circuit Judge:
 
 
 1
 Plaintiff Carbotrade S.p.A. ("Carbotrade") appeals from an opinion and order of the United States District Court for the Southern District of New York (John G. Koeltl, District Judge ) that granted the motion of defendant Bureau Veritas ("BV") for summary judgment pursuant to Fed.R.Civ.P. 56(c). Carbotrade's suit followed the sinking of a vessel, the Star of Alexandria, which had been classified by BV--negligently in the view of Carbotrade--as complying both with international conventions and with BV's own rules and regulations. The district court, applying United Kingdom law, concluded that no duty was owed by a classification society, such as BV, to a third-party, such as Carbotrade. On appeal, Carbotrade argues that the district court erred in applying United Kingdom law; that Greek law, or alternatively, United States admiralty law, governs this dispute; and that under either Greek or United States law BV may be held liable by Carbotrade for negligent misrepresentation. Carbotrade further argues that the district court erred in concluding that Carbotrade could not establish that it relied on the alleged negligent misrepresentations, BV owed Carbotrade a duty. We vacate and remand.
 
 BACKGROUND
 
 2
 This controversy originated when the Star of Alexandria, a ship registered in the United Kingdom dependency of Gibraltar, sank on April 17, 1989, in international waters while en route to New Jersey from Greece. The facts surrounding the incident are fully set forth in the opinion of the district court, reported at Carbotrade SpA v. Bureau Veritas, 901 F.Supp. 737 (S.D.N.Y.1995), familiarity with which is presumed. We summarize only those facts that are pertinent to this appeal.
 
 
 3
 The Star of Alexandria was owned by Caribene Investments, Ltd., a corporation organized under the laws of Gibraltar. Caribene had contracted with Palm Navigation, a company with offices in Greece, to manage the vessel. On February 28, 1989, less than two months before the Star of Alexandria sank, Caribene chartered the vessel to Carbotrade, an Italian corporation with its principal place of business in Italy. Carbotrade subchartered the vessel to Essex Cement Company, a New Jersey partnership and affiliate of third-party defendant Titan Cement Company, the owner of the cement cargo that went down with the Star of Alexandria.
 
 
 4
 After the vessel sank, Carbotrade sued BV. BV is a French classification society with its principal place of business in France and offices in ports throughout the world. A classification society sets standards for the quality and integrity of vessels and performs surveys to determine whether vessels are in compliance with the classification society's rules and regulations, national laws, and international conventions. If a vessel passes inspection, the classification society either issues a certificate attesting to the vessel's conformity with the applicable rules, regulations, laws, and conventions or endorses an existing certificate with a visa reflecting the survey. If the vessel fails to pass the inspection, the classification society either does not issue the certificate or withdraws the existing certificate.
 
 
 5
 At least as far back as 1985, BV contracted with Caribene to survey the Star of Alexandria. Between March 6 and March 28, 1989, BV conducted several surveys of the Star of Alexandria: a survey to determine whether the vessel was in compliance with certain international conventions; a bottom survey to determine whether the vessel required dry docking; and an intermediate survey to determine the soundness of its interior compartments. After completing the surveys, BV issued certificates indicating that the Star of Alexandria was in compliance with the international conventions and endorsed the existing ship's classification certificate on the basis of the bottom and intermediate surveys.
 
 
 6
 Carbotrade claims that BV negligently performed the bottom and intermediate surveys and thus negligently endorsed the classification certificate. In particular, Carbotrade alleges that BV's surveyor, Konstantinos Stavropoulos, was negligent in failing to withdraw the classification certificate after he noticed that the vessel's wingtanks were leaking. Carbotrade claims that cracks in the wingtanks reduced the vessel's strength and contributed to the sinking of the Star of Alexandria. Carbotrade further argues that under BV's own rules and regulations, a new visa cannot be issued when the surveyor discovers cracks in the wingtanks. If the visa had not been issued, the Star of Alexandria's previous classification certificate would have lapsed, and the vessel would not have been "in class" for the period of the voyage.
 
 
 7
 Carbotrade maintains that it relied on BV's representation that the vessel was fit and suitable to carry cargo and that, if BV had refused to extend the hull certificate, Carbotrade would not have allowed the vessel to sail with the cargo on board. BV responds in its brief on appeal that its "Rules [do] not require that the vessel's wing tanks [ ] be absolutely watertight for the vessel to pass the intermediate survey." In addition, BV notes that during March 1989, an independent surveyor hired by Essex also inspected and passed the vessel. The surveyor, Constantine Tsamados, saw some water leaking from the wingtanks, but noted that the wingtanks would not be used during the voyage and, thus, certified the vessel as suitable for the carriage of the cement cargo that was ultimately boarded. Carbotrade dismisses the significance of Tsamados's survey, claiming that the "purpose of [Tsamados'] survey was limited to establishing that the holds were clean, dry, and rust free, and not to assessing the seaworthiness of the vessel."
 
 
 8
 Because the Star of Alexandria was registered in Gibraltar, the United Kingdom Department of Transportation investigated the sinking. The department concluded that the vessel sank because it "was so overloaded and reduced in structural strength that, having experienced exceptionally stormy weather conditions crossing the Atlantic, [it] broke in two and sank." Carbotrade argues that BV's topside wingtank test was designed to detect the structural weakness that caused the ship to break in two.
 
 
 9
 Carbotrade first invoked arbitration, and obtained a default judgment, against Caribene in London pursuant to the arbitration clause in the head charter. Caribene has no known assets and the judgment has not been satisfied. Caribene's insurers have refused to satisfy this judgment because they claim that Caribene was in violation of Gibraltar's manning requirements.
 
 
 10
 In January 1995, BV moved for summary judgment in this action. BV argued that the law of the United Kingdom applied to the dispute and that under United Kingdom law, classification societies do not owe a duty to third parties. See Marc Rich & Co. v. Bishop Rock Marine Co. (The Nicholas H), [1995] 3 All E.R. 307 (H.L.). BV argued further that, in any event, neither Carbotrade nor Essex (which had assigned its claim to Carbotrade) could establish that it had relied on BV's classification certificate. The district court, in an opinion and order filed on October 19, 1995, held that United Kingdom law applies and granted summary judgment to BV. In addition, the district court found that even if United States law applied, BV did not owe a duty to Carbotrade. Finally, the district court agreed with BV that even if such a duty were owed, there was insufficient evidence that Carbotrade or Essex relied on the relevant classification certificates. Carbotrade now appeals.
 
 DISCUSSION
 
 11
 Our review of a grant of a motion for summary judgment is de novo. Schonholz v. Long Island Jewish Medical Ctr., 87 F.3d 72, 77 (2d Cir.1996). A lower court must enter summary judgment in favor of the moving party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In ruling on a motion for summary judgment,
 
 
 12
 [a] judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [non-movant] on the evidence presented. The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant].
 
 
 13
 Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Furthermore, a district judge must view the evidence in the light most favorable to the non-moving party and must draw all inferences in favor of that party. See Sports Auth., Inc. v. Prime Hospitality Corp., 89 F.3d 955, 960 (2d Cir.1996).
 
 
 14
 The first and foremost task before us on this appeal is to decide which country's law applies to Carbotrade's cause of action for negligent misrepresentation. The district court concluded that, under the maritime conflicts of law test first announced by the Supreme Court in Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), and subsequently elaborated in Romero v. International Terminal Operating Co., 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959), and Hellenic Lines Ltd. v. Rhoditis, 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970) (collectively, the "Lauritzen triad"), the law of the Star of Alexandria's flag should apply. Because the Star of Alexandria flew the flag of Gibraltar, the district court applied the law of the United Kingdom. The House of Lords has held that a third-party may not bring an action for negligent misrepresentation in connection with a classification certificate, see Marc Rich & Co., [1995] 3 All E.R. at 332, and the district court therefore dismissed Carbotrade's cause of action.
 
 
 15
 Carbotrade argues that the district court should have applied the law of Greece, which, Carbotrade maintains, permits an injured third party to maintain a cause of action against a classification society for negligent misrepresentation. We agree with Carbotrade that Greek law controls, but, because the issue was not fully explored below, we remand to the district court to determine what duty, if any, Greek law imposes on BV.
 
 
 16
 The traditional choice of law doctrine in tort cases, and adopted by the First Restatement of Conflicts of Law, is the lex loci delicti rule, which emphasizes the place of the alleged wrongful act and is still followed in a few American states. See Symeon C. Symeonides, Choice of Law in the American Courts in 1993 (and in the Six Previous Years), 42 Am. J. Comp. L. 599, 606 (1994). Virtually all American states have abandoned the traditional approach and the majority of them have adopted the interest analysis approach of the Second Restatement of Conflicts of Law or some other form of interest analysis. Id. at 609-12. The Second Restatement's approach, as with other forms of interest analysis, continues to attach importance to the place of the alleged wrongful act, but only as part of a broader test that determines which jurisdiction has the greatest interest in the dispute or the most substantial contacts with it. Although interest analysis has come under increasing attack by academics in recent years, see Larry Kramer, Rethinking Choice of Law, 90 Colum. L.Rev. 277, 278-79 & nn. 1-7 (1990) (summarizing the criticisms), courts continue to forgo the traditional approach, choosing instead to adopt some form of interest analysis, see Symeon C. Symeonides, Choice of Law in the American Courts in 1994, 43 Am. J. Comp. L. 1, 2-4 (1995) (noting that in 1994 three more states abandoned the traditional methodology and adopted that of the Second Restatement).
 
 
 17
 The Supreme Court, in the Lauritzen triad, similarly has rejected a strict lex loci delicti approach to resolving conflicts questions in maritime tort cases and has adopted an interest analysis that looks to: (1) the place of the wrongful act; (2) the law of the ship's flag; (3) the domicile of the injured party; (4) the domicile of the shipowner; (5) the place of the contract;[1] (6) the inaccessibility of the foreign forum; (7) the law of the forum; and (8) the shipowner's base of operations. See Rhoditis, 398 U.S. at 309, 90 S.Ct. at 1734; Lauritzen, 345 U.S. at 583-92, 73 S.Ct. at 928-33; see also Romero, 358 U.S. at 382, 79 S.Ct. at 485-86 (noting that the Lauritzen test is not limited to Jones Act cases but is generally applicable to maritime tort actions). The weight to be given each factor varies from case to case and the list is not an exhaustive one. Rhoditis, 398 U.S. at 308-09, 90 S.Ct. at 1733-34.
 
 
 18
 The district court concluded that, in the circumstances of this case, the Lauritzen factors pointed "indiscriminately to much of the globe" and that therefore the law of the flag would govern in the absence "of proof that another nation has a more significant, countervailing interest." Carbotrade, 901 F.Supp. at 743 (quotation omitted). As we noted in Sundance Cruises Corp. v. American Bureau of Shipping, 7 F.3d 1077, 1082 (2d Cir.1993), cert. denied, 511 U.S. 1018, 114 S.Ct. 1399, 128 L.Ed.2d 72 (1994), the Supreme Court in Lauritzen did "emphasize[ ] the importance of the law of the flag, which 'overbears most other connecting events in determining applicable law.' " (quoting Lauritzen, 345 U.S. at 585, 73 S.Ct. at 930). The Lauritzen Court noted that the strong considerations in favor of applying the law of the flag "must prevail unless some heavy counterweight appears." 345 U.S. at 586, 73 S.Ct. at 930.
 
 
 19
 The law of the flag, however, is only one of several factors to be considered and in Rhoditis itself the Supreme Court applied United States law notwithstanding that the ship flew a Greek flag, the plaintiff was a Greek citizen, and his employment contract was signed in Greece. 398 U.S. at 308, 310, 90 S.Ct. at 1733-34, 1734-35. The Supreme Court in Rhoditis noted with approval our decision in Bartholomew v. Universe Tankships, Inc., 263 F.2d 437, 441 (2d Cir.1959), in which we stated that the decision as to whether to apply United States law, specifically the Jones Act, to a particular tort claim by a seaman against his employer "involves the ascertainment of the facts or groups of facts which constitute contacts between the transaction involved in the case and the United States, and then deciding whether or not they are substantial." The Rhoditis Court rejected the law of the flag precisely because of "the substantial and continuing contacts that [the] owner has with this country." 398 U.S. at 310, 90 S.Ct. at 1734.
 
 
 20
 Although Rhoditis was a Jones Act case, we believe that nothing in the Court's opinion limits its application to such cases and Rhoditis 's emphasis on applying the law of the state with the most substantial contacts to the event giving rise to the claim applies to all maritime tort cases. Lauritzen itself was a Jones Act case, but the Supreme Court in Romero has stated plainly that the Lauritzen factors apply to all maritime tort cases. 358 U.S. at 382, 79 S.Ct. at 485-86. Similarly, we can discern no reason why Rhoditis 's emphasis on choosing the law of the state with the most substantial and continuing contacts should be treated any differently, and it is with this in mind that we address the Lauritzen factors.
 
 
 21
 We first note that certain Lauritzen factors do not apply to the case before us. First, in contrast to Lauritzen, no direct contractual relationship exists between the plaintiff and the defendant, so the fifth factor--the place of the contract--is not involved in our analysis. Also, Lauritzen 's sixth factor--the accessibility of the foreign forum--is irrelevant. As Lauritzen itself notes, this factor is more pertinent to a forum non conveniens test than to a choice of law test, and the Lauritzen Court included it as a factor to be weighed in favor of applying the Jones Act where the compensation scheme of another country only would permit suit in its own courts or when the plaintiff is present in that country. 345 U.S. at 589-90, 73 S.Ct. at 931-32. In this case there is no bar to the district court applying either United Kingdom or Greek law, and neither forum would require the plaintiff to be present there to institute suit. Finally, the seventh Lauritzen factor--the law of the forum--is irrelevant here because this litigation is in the courts of the United States. See also Jack L. Allbritton, Choice of Law in a Maritime Personal Injury Setting, 43 La. L.Rev. 879, 883 (1983) (noting that Lauritzen assigned little weight to inaccessibility and law of the forum); Michael Boydston, Note, Cruz v. Chesapeake Shipping and the Choice-of-Law Problem in Admiralty Actions, 27 Tex. Int'l L.J. 419, 439-40 (1992) (noting that all three factors--place of contracting, inaccessibility of the foreign forum, and law of the forum--serve no useful purpose and have been denigrated).
 
 
 22
 We also believe that the domicile and base of operation factors must be adjusted to the particular facts of this case. Unlike the typical Jones Act case, which involves a plaintiff seaman and a defendant shipowner, this case involves three different parties: (1) a plaintiff who chartered the vessel, (2) a defendant classification society, and (3) the shipowner, which actually contracted for the services of the classification society but is not a party to this action. The domiciles of the plaintiff and the defendant plainly are relevant here. Furthermore, we believe that the domicile of the shipowner continues to be relevant, not only because it is expressly mentioned in Lauritzen, but because it is the shipowner who was in privity of contract with BV. And just as Rhoditis found the shipowner's base of operations, in addition to its domicile, to be important under the Lauritzen test, 398 U.S. at 309, 90 S.Ct. at 1734, we believe the base of operations of all three parties, and not simply their domicile, to be relevant to our consideration.
 
 
 23
 To summarize, we believe that five Lauritzen factors are relevant to our determination of the proper law to apply in this case: (1) the place of the alleged wrongful act, (2) the law of the ship's flag, (3) the domicile and base of operations of the plaintiff, (4) the domicile and base of operations of the defendant, and (5) the domicile and base of operations of the shipowner. We believe that in the circumstances of this case these factors, taken together, favor the application of Greek law.
 
 
 24
 The first factor--the place of the wrongful act--plainly favors the application of Greek law: BV is alleged to have issued negligently the defective classification certificates in Greece. The fourth factor--the domicile and base of operations of BV--also supports the application of Greek law. BV is a French corporation and is therefore domiciled in France.[2] However, it maintains one of its many permanent offices in Piraeus, Greece. The presence of an office of a defendant in a particular country might not always be sufficient to tip this factor in favor of applying the law of that country. But unlike the typical Jones Act case, wherein a seaman is injured aboard a vessel and the place of the tort is often happenstance, BV's conduct was out of an office in a country where BV had chosen to establish itself and thereby become subject to that country's laws. Cf. Rhoditis, 398 U.S. at 310, 90 S.Ct. at 1734-35 (looking to the real nature of the operations). Because it is the actions of employees of BV's Greek office that give rise to the instant dispute, we believe that this factor weighs heavily in favor of applying Greek law over that of the United Kingdom. Cf. Restatement (Second) of Conflicts of Law § 145(2)(c) (1971) (noting that the place of business of the parties is relevant in choosing which tort law to apply).
 
 
 25
 Furthermore, the fifth factor--the domicile and base of operations of the shipowner--favors the application of Greek law. Although the nominal shipowner, Caribene, was a Gibraltar corporation, there is little doubt that Caribene was simply a shell corporation.[3] The actual owners of the Star of Alexandria, as distinguished from its paper owner, were Greek. Both of Caribene's directors are Greek residents, and Palm Navigation, the company that operated the Star of Alexandria, is located in Greece.[4] Therefore, the fifth Lauritzen factor weighs in favor of applying Greek law.
 
 
 26
 The third factor, which looks to the domicile and base of operations of the plaintiff, favors the application of neither Greek nor United Kingdom law, nor one over the other. No one disputes that Carbotrade is an Italian corporation with its principal place of business in Italy. Furthermore, Carbotrade's assignor (Essex Cement) is a New Jersey partnership with its principal place of business in New Jersey.
 
 
 27
 Finally, the Star of Alexandria sailed under the flag of the United Kingdom, a fact that ordinarily would point to the application of the law of that country. Carbotrade repeats its argument that the Star of Alexandria flew the United Kingdom's flag simply as a flag of convenience and that, thus, this factor should be ignored. The district court rejected this argument, stating that "Carbotrade has failed to offer any evidence that the shipowner selected a flag in order to avoid application of the laws of more stringent countries." Carbotrade, 901 F.Supp. at 744. We disagree with the district court's finding that Carbotrade submitted no evidence to this effect. Carbotrade put in evidence demonstrating that Palm Navigation, which had the responsibility of selecting the Star of Alexandria's flag, was not sure that the vessel always flew under the flag of Gibraltar and that Palm Navigation would have changed the Star of Alexandria's flag if the vessel had been required to comply with United Kingdom law for the manning of vessels.
 
 
 28
 We need not decide, however, whether the Star of Alexandria did indeed sail under a flag of convenience, because, even assuming that the district court was correct on this issue, we find that the factors favoring the application of Greek law greatly outweigh this factor. The fact that the allegedly tortious act was committed in Greece, as well as the presence of BV, the vessel's owners, and the vessel's operating company in that country, give Greece considerably more substantial contacts than the United Kingdom with this dispute. Therefore, we believe that Greek law should apply.
 
 
 29
 BV contends that we nonetheless should favor the law of the flag in order to create certainty as to which laws apply to claims against classification societies. We disagree. Whatever significance law of the flag may have in cases where the ship or its owner is a party and where other factors fail to point clearly to another jurisdiction's law, we see no reason to apply the law of the flag here in preference to that of another jurisdiction whose ties are more pertinent to the dispute, especially given the fact that neither the ship nor the owner is a party.
 
 
 30
 Carbotrade contends that under Greek law, BV's duty not to engage in negligent misrepresentations extended to Carbotrade. In the district court, Carbotrade submitted a single affidavit from a Greek lawyer, which stated in conclusory fashion that Greek law creates such a duty; the affidavit did not state specifically that Greek law would create a duty from defendants to third parties for negligent misrepresentations under these circumstances. Cf. Marc Rich & Co., [1995] 3 All E.R. at 322 (noting that even owners of vessels apparently have never successfully sued a classification society for damages). BV has not yet submitted any proof as to what duty Greek law may or may not impose under these facts. Because we remain uncertain as to what Greek law may require, we decline at this stage to interpret Greek law as Carbotrade would have us do. In these circumstances, we think the preferable course is to remand this case to the district court to determine in the first instance the parameters of Greek law as they apply to this case.
 
 
 31
 Finally, we note that the district court erred in concluding that Carbotrade could not, as a matter of law, establish reliance on BV's representations. The district court reasoned that Carbotrade was aware of the leakage in the wingtanks--because Tsamados, Carbotrade's surveyor, was aware of it--and had ample opportunity to refuse the vessel under both the charter and the subcharter. Carbotrade, 901 F.Supp. at 749. Carbotrade, however, has alleged that although Tsamados was aware of the leakage, he was not aware that this leakage indicated that the Star of Alexandria was not seaworthy. There was evidence that Tsamados's responsibility was only to ensure that the cargo holds were watertight and dry, and he testified that he relied upon BV's survey to ensure that the vessel was seaworthy. We believe that there is sufficient evidence such that a reasonable trier of fact could find that Carbotrade relied on Bureau Veritas's representations.
 
 CONCLUSION
 
 32
 For the foregoing reasons, we vacate the judgment of the district court, and we remand for further proceedings consistent with this opinion.
 
 VAN GRAAFEILAND, Circuit Judge, dissenting:
 
 33
 The majority today abandons "the most venerable and universal rule of maritime law[,] ... which gives cardinal importance to the law of the flag," Lauritzen v. Larsen, 345 U.S. 571, 584, 73 S.Ct. 921, 929, 97 L.Ed. 1254 (1953), in choice of law questions arising out of maritime torts. I would apply the law of the flag to the instant case and affirm the judgment of the district court.
 
 
 34
 On April 17, 1989, the M/V STAR OF ALEXANDRIA sank while en route to the United States from Greece. The ship was owned by Caribene Investments, Ltd. ("Caribene"), a corporation organized under the laws of Gibraltar, a dependency of the United Kingdom ("U.K."). The ship was registered in Gibraltar and flew a British flag. Under the authority of the Government of Gibraltar, the ship was surveyed for safety construction, safety equipment, load line, radiotelegraphy and pollution prevention, and received appropriate certificates of approval, all of which were issued in London. It also was subject to strict British manning laws, including the requirement that at least one British officer be on board at all times. Its failure to comply with this requirement ultimately led its insurer to deny coverage for cargo losses sustained as a result of the ship's sinking. Moreover, the charter party between Caribene and plaintiff, Carbotrade S.p.A. ("Carbotrade"), called for disputes to be arbitrated in London. Finally, the accident was investigated by the U.K. Department of Transportation. Despite these extensive contacts between the STAR OF ALEXANDRIA and the U.K., particularly the flying of the U.K. flag, my colleagues conclude that Greek law, rather than U.K. law, governs this dispute. I disagree.
 
 
 35
 In Lauritzen, a case arising under the Jones Act, 46 U.S.C. § 688, the Supreme Court enumerated seven factors that courts generally look to in resolving maritime choice of law questions: (1) the place of the wrongful act; (2) the law of the ship's flag; (3) the allegiance or domicile of the injured party; (4) the allegiance of the shipowner; (5) the place of the contract; (6) the inaccessibility of the foreign forum; and (7) the law of the forum. 345 U.S. at 583-92, 73 S.Ct. at 928-33. The Court later added an eighth consideration, namely the shipowner's base of operations. Hellenic Lines Ltd. v. Rhoditis, 398 U.S. 306, 309, 90 S.Ct. 1731, 1734, 26 L.Ed.2d 252 (1970). This list is not exhaustive, and the factors are not necessarily accorded equal weight. Id. at 308-09, 90 S.Ct. at 1733-34. However, overarching concerns of comity, pragmatism and predictability led the Lauritzen Court to declare that "the weight given to the ensign overbears most other connecting events in determining applicable law." 345 U.S. at 585, 73 S.Ct. at 930. Accordingly, the law of the flag should apply "unless some heavy counterweight appears." Id. at 586, 73 S.Ct. at 930; see also Tjonaman v. A/S Glittre, 340 F.2d 290, 292 (2d Cir.) ("[T]he starting point for weighing and evaluating of factors is consideration of [the law of the flag]."), cert. denied, 381 U.S. 925, 85 S.Ct. 1561, 14 L.Ed.2d 684 (1965). The district court, in my opinion, properly applied this principle.
 
 
 36
 The travels and travails of the STAR OF ALEXANDRIA were truly international in character. In addition to the substantial British contacts present here, the Lauritzen factors suggest that other nations also share an interest in this litigation. The defendant, Bureau Veritas ("B.V."), is a French corporation with its principal place of business in France. The plaintiff, Carbotrade, is an Italian corporation. Its assignor, Essex Cement, is a New Jersey partnership, and the suit was brought in a United States court. Finally, the vessel sank in international waters. In the light of these facts, the district court concluded that "the Lauritzen factors 'point indiscriminately to much of the globe.' " Carbotrade SpA v. Bureau Veritas, 901 F.Supp. 737, 743 (S.D.N.Y.1995) (quoting Sundance Cruises Corp. v. American Bureau of Shipping, 7 F.3d 1077, 1082 (2d Cir.1993), cert. denied, 511 U.S. 1018, 114 S.Ct. 1399, 128 L.Ed.2d 72 (1994)). It is precisely in these circumstances that the law of the flag takes on particular significance because "it is a unifying factor that can govern the potential liabilities of a classification society to third parties with whom the society has no direct contractual relations." Id. at 744.
 
 
 37
 At the outset, it is pertinent to note that in the district court Carbotrade argued principally for the application of United States law and only "half-heartedly" argued in the alternative that Greek law should govern. Id. My colleagues now insist, however, that the place of the wrongful act plainly favors the application of Greek law. Ante at 91. This statement finds support in neither the facts nor the law. "The place of the wrongful act is accorded little weight in traditional maritime cases, in which the locality of the ship changes constantly." Fogleman v. ARAMCO (Arabian Am. Oil Co.), 920 F.2d 278, 282 (5th Cir.1991); Cruz v. Maritime Co. of Philippines, 549 F.Supp. 285, 288 (S.D.N.Y.1982), aff'd, 702 F.2d 47 (2d Cir.1983). Moreover, my colleagues do not fix correctly the location of the wrongful act. At issue here is a claim of negligent misrepresentation. "In order to state a cause of action for negligent misrepresentations, the plaintiff must allege that: (1) the defendant, in the course of his profession, supplied false information for the plaintiff's guidance in a business transaction; (2) the defendant failed to exercise reasonable care in gathering the information; (3) the plaintiff relied on the information in a transaction the defendant intended it to influence; and (4) the plaintiff thereby suffered pecuniary loss." Grass v. Credito Mexicano, S.A., 797 F.2d 220, 223 (5th Cir.1986), cert. denied, 480 U.S. 934, 107 S.Ct. 1575, 94 L.Ed.2d 766 (1987); see 1 New York Pattern Jury Instructions--Civil § 2:230 (2d ed. 1974).
 
 
 38
 The law is clear that in a tort action such as this, an actionable wrong does not come into being absent the above-quoted item 4, proof of damage or loss. See Sack v. Low, 478 F.2d 360, 365 (2d Cir.1973) (cause of action for fraud does not arise until loss is suffered);
 
 
 39
 Santana, Inc. v. Levi Strauss & Co., 674 F.2d 269, 272 (4th Cir.1982) (injury is last element of a tort);
 
 
 40
 Ritchie Enters. v. Honeywell Bull, Inc., 730 F.Supp. 1041, 1046 (D.Kan.1990) (place where injury suffered generally considered to be where wrong occurred).
 
 
 41
 " '[I]n actions of negligence damage is of the very gist and essence of the plaintiff's cause.' " Schmidt v. Merchants Despatch Transp. Co., 270 N.Y. 287, 300, 200 N.E. 824 (1936) (quoting Comstock v. Wilson, 257 N.Y. 231, 235, 177 N.E. 431 (1931)). I therefore disagree with the majority holding that the tort upon which Carbotrade bases its claim occurred in Greece. To paraphrase a statement of the New York Court of Appeals in Martin v. Julius Dierck Equip. Co., 43 N.Y.2d 583, 591, 403 N.Y.S.2d 185, 374 N.E.2d 97 (1978), Carbotrade's assignor "possessed no cause of action ... any where in the world until [it] was injured in [international waters, 2000 miles west of Greece]." The tort at issue herein occurred on the high seas, not in Greece.
 
 
 42
 I am equally at odds with the majority's assertion that "[t]he actual owners of the STAR OF ALEXANDRIA, as distinguished from its paper owner, were Greek." Ante at 92. In the complaint that initiated this litigation, Caribene was described as "owner of the 'M/V STAR OF ALEXANDRIA.' " When B.V. moved to dismiss the complaint, Carbotrade's attorney submitted an affidavit in which he described Caribene as "at all material times, a corporation organized and existing by virtue of the laws of the Dependency of Gibraltar and was the registered owner of the M.V. 'STAR OF ALEXANDRIA.' " The chief legal officer of B.V. filed an affidavit in support of B.V.'s motion to dismiss in which he stated that B.V. contracted to class the STAR OF ALEXANDRIA with Caribene, "the vessel's owner." These statements never were challenged.
 
 
 43
 If share ownership is determinative of corporate citizenship, Greece is conspicuous by its absence. Caribene's 1989 Annual Return showed that it had 400 shares of stock outstanding, one of which was held by Gateway Nominees Ltd., 123 Main Street, Gibraltar, and the remaining 399 by Marissa Investment Trust Inc., 80 Broad Street, Monrovia, Liberia.
 
 
 44
 In separate orders, District Judges Patterson and Koeltl described Caribene, a corporation organized under the laws of Gibraltar, as the ship's owner, Judge Patterson in an unpublished opinion and Judge Koeltl at 901 F.Supp. at 744. In sum, I suggest that the majority errs, both legally and factually, in its assertion that the STAR OF ALEXANDRIA's "actual owners," whom my colleagues have not identified, were Greek.
 
 
 45
 I am concerned about the facility with which my colleagues "pierce the veil" of Caribene's corporate existence. My colleagues' assertion that Caribene "was simply a shell corporation," ante at 92, is strong language. A shell corporation is a "corporate frame, containing few, if any, assets, kept alive by required filings, generally for future use." Black's Law Dictionary 343 (6th ed. 1990); see also 8A Am.Jur.2d Corporations § 738, at 649. Until the STAR OF ALEXANDRIA foundered on April 17, 1989, Caribene was its owner. To say that this large, 600 foot, ocean-going cargo vessel of 22,627 gross tonnage with an insured value of $3 million and a chartering rate of $7,800 per day was not a substantial asset would be to blink reality.
 
 
 46
 My colleagues' discussion of the "flag of convenience" doctrine, and particularly its possible application to Gibraltar, is both unnecessary and unfounded. According to Athanasios Zachariades, the chief officer of Palm Navigation, which managed the STAR OF ALEXANDRIA, Palm was located in either Liberia or Panama, and none of its shareholders was Greek. The majority cites Zachariades' testimony to the effect that, if the STAR OF ALEXANDRIA had been required to comply with U.K. law for the manning of vessels, he would have changed the ship's flag. Ante at 92. The fact is that the vessel did not comply fully with U.K. law, and it is that very lack of compliance that led to this litigation. That, subsequent to the events herein, Palm Navigation may have hoisted other nations' flags above its managed ships to benefit from more lenient maritime laws only reinforces the conclusion that sailing under the U.K. flag was not done for evasive purposes.
 
 
 47
 "Ships ... register in flag of convenience countries because those countries subject them to little or no control. Fees and taxes are low, labor regulations and safety standards are minimal, and ship movements are largely unhampered." Alcoa S.S. Co. v. M/V Nordic Regent, 654 F.2d 147, 160 (2d Cir.) (en banc) (Van Graafeiland, J., dissenting), cert. denied, 449 U.S. 890, 101 S.Ct. 248, 66 L.Ed.2d 116 (1980); see Jose v. M/V Fir Grove, 801 F.Supp. 358, 363 (D.Or.1992). A paradigmatic example of such a country is Liberia, home of Marissa Investment Trust Inc. If that company wanted Caribene to operate under a flag of convenience, it does not make sense that it would have left Liberia, whose name is synonymous with "flag of convenience," and incorporated in the United Kingdom. There is nothing in the record to show that Gibraltar, an arm of the United Kingdom, is a flag of convenience country.
 
 
 48
 This Court recently reaffirmed the preeminence of the law of the flag in Sundance, supra, a case factually similar to the one at bar. In Sundance, plaintiffs were the owners of a Bahamian flag ship which sank off the coast of British Columbia. They sued the classification society which had issued certificates representing the vessel's compliance with international safety standards as well as its own classification rules. Under Bahamian law, the defendants were entitled to immunity in connection with their issuance of certain of the certificates. The district court noted that factors other than the flag pointed toward many nations and held that, under those circumstances, Bahamian law applied. We affirmed, reemphasizing "the importance of the law of the flag, which 'overbears most other connecting events in determining applicable law.' " 7 F.3d at 1082 (quoting Lauritzen, 345 U.S. at 585, 73 S.Ct. at 930). This reasoning is clearly applicable in the instant case.
 
 CONCLUSION
 
 49
 The STAR OF ALEXANDRIA was entered in a United Kingdom protection and indemnity association. That company denied coverage for all claims arising out of the STAR OF ALEXANDRIA's sinking because of Caribene's failure to comply with the manning requirements of Gibraltar. Thus, the law of the flag already has played a substantial role in the events at issue herein. My colleagues suggest no persuasive reason why the law of Gibraltar should be supplanted now by the law of Greece.
 
 
 50
 I would affirm.
 
 
 
 [1]
 The Lauritzen Court, in discussing the applicability of the place of the contract, noted that "the tendency of the law is to apply in contract matters the law which the parties intended to apply," 345 U.S. at 589, 73 S.Ct. at 931 (footnote omitted), and in a case where the parties have made a choice of law in a contract between them, this fact might also be an appropriate additional factor to weigh. We do not reach this issue, however, because there is no contract between Carbotrade and BV
 
 
 [2]
 In actuality, a corporation does not have domicile but instead has citizenship. See Moore v. General Motors Pension Plans, 91 F.3d 848, 849-50 (7th Cir.1996) (per curiam). Citizenship, in turn, is based on the place of incorporation and, at least for the purposes of diversity jurisdiction, the principal place of the corporation's business. Id
 
 
 [3]
 Although BV disputes this, it presents no evidence that Caribene was anything other than a shell corporation and instead only takes exception to Carbotrade's reliance on Caribene's Annual Return for 1989 because it is dated four days after the sinking of the Star of Alexandria. We see no relevance to the four day gap in time and note that the return amply supports Carbotrade's position
 
 
 [4]
 Palm Navigation was either a Liberian or a Panamanian company; even its general manager, Athanasios Zachariades, could not remember which. However, Palm Navigation's offices seem to have been located in Greece