**SEALORD MARINE CO., LTD., and Tide Line, Inc., on their own behalf and as trustees for any party whose interests may be concerned, Plaintiffs,**

v.

**AMERICAN BUREAU OF SHIPPING Defendant.**

**No. 00 CIV. 8197 JGK.**

United States District Court,
S.D. New York.

Sept. 13, 2002.

Thomas L. Tisdale, Tisdale & Lennon, LLC, New York City, for Sealord Marine Co., Ltd.

Robert C. Clyne, Hill Rivkins & Hayden LLP, New York City, for American Bureau of Shipping.

## OPINION AND ORDER

KOELTL, District Judge.

This is an action to recover damages that the plaintiffs, Sealord Marine Co., Ltd. ("Sealord") and Tide Line, Inc. ("Tide Line") allegedly sustained in purchasing a vessel known as the "M/V Amethyst" due to the conduct of the defendant, the American Bureau of Shipping ("ABS"), in allegedly performing negligent inspections of the vessel and issuing improper certifications relating to the condition of the vessel. The action was brought in this Court based on diversity of citizenship jurisdiction but it is clear and the parties agree that the substantive claims are alleged maritime torts and the substantive law to be applied is federal admiralty law. *See Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 628, 79 S.Ct.

406, 3 L.Ed.2d 550 (1959); *Pope & Talbot v. Hawn,* 346 U.S. 406, 410–11, 74 S.Ct. 202, 98 L.Ed. 143 (1953); *Capozziello v. Brasileiro,* 443 F.2d 1155, 1157 (2d Cir. 1971).

The defendant moves pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment dismissing the plaintiffs' claims.

## I.

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs. Ltd. P'ship,* 22 F.3d 1219, 1223 (2d Cir. 1994). "The trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo,* 22 F.3d at 1224.

The moving party, the defendant in this case, bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. The substantive law governing the case will determine those facts that are material and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether summary judgment is appro-

priate, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); *see also Gallo,* 22 F.3d at 1223.

If the moving party meet its burden, the burden shifts to the nonmoving parties, the plaintiffs in this case, to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). With respect to the issues on which summary judgment is sought, if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving parties, summary judgment is improper. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir.1994).

Unless otherwise indicated, the following facts are either undisputed or are matter of public record. The plaintiff Sealord is a corporation organized and existing under the laws of Cyprus with its principal place of business in Cyprus. (Def.'s Rule 56.1 St. ¶ 1.) During all of the times relevant to this case, Sealord was managed by Tide Line, who acted as Sealord's agent in all of the transactions relevant to this case. (Def.'s Rule 56.1 St. ¶ 2; Pl.'s Rule 56.1 St. ¶¶ 1, 9–10.) Tide Line is a Liberian corporation with its principal place of business in Piraeus, Greece. (Def.'s Rule 56.1 St. ¶ 2; Tr. dated 8/29/02.)

The defendant, ABS, is a classification society. (Def.'s Rule 56.1 St. ¶ 3.) ABS is a not-for-profit organized and existing by special act of the New York State legislature with its headquarters and principal place of business in Houston, Texas (Def.'s Rule 56.1 St. ¶ 3.) Classification societies generally develop rules, guides, standards and other criteria for the design and con-

struction of ships. When requested, a classification society reviews the design and surveys a ship before, during, and after construction to verify compliance with the relevant international conventions and applicable rules of the classification society. *See generally Sundance Cruises Corp. v. The American Bureau of Shipping,* 7 F.3d 1077, 1078 (2d Cir.1993); *see also* Def.'s Rule 56.1 St. ¶¶ 12–14.

The M/V Amethyst, a vessel that was under the flag of Cyprus, was originally owned by Amethyst Maritime Co. ("Amethyst"), a Cyprus corporation, and managed by Combine Marine, Inc. ("Combine"), a company with its principal place of business in Greece. (*See* Affirmation of Thomas L. Tisdale served October 29, 2001 ("Tisdale Aff.") ¶ 3.) In August 1999, while under this ownership, the defendant performed an annual survey of the vessel in Piraeus, Greece. (*See* ABS Survey Status Report dated December 2, 1999 ("Status Report"), at 1, attached as Ex. 5 to Tisdale Aff.) The plaintiffs allege that serious defects existed in the cargo holds at this time, and that the defendant would have identified these defects if it had conducted a proper survey and had properly followed its own ABS rules and guidelines. (*See* Tisdale Aff. ¶¶ 3–4.) The inspection concluded with no recommendations. *See generally* Status Report.

In early February 2000, the plaintiffs allege that they first became aware that the M/V Amethyst was for sale through their London broker, Frank Cordell. (*See* Tisdale Aff. ¶ 5.) The plaintiffs allege that they asked for an ABS Survey Status Report during these early negotiations, and that Tideline was provided with such a report from the defendant's Piraeus Office, where the Survey Status Report was reviewed. (Pl.'s Rule 56.1 St. ¶ 6; Tr. dated 8/29/0; Tisdale Aff. ¶ 5.) This Status Report indicated that the defendant had conducted the annual survey in Piraeus,

Greece in August 1999, and that the defendant had conducted a subsequent Damage/Repair Survey in Lagos in October 1999. *See* Status Report at 4. The Report stated that "No open Substantial Corrosion information is available for this vessel," *id.* at 4, and identified some damages that were repaired but needed to be "further dealt with to the satisfaction of an attending surveyor not later than 30 JUN 2000." *Id.* at 3. The plaintiffs allege that the fact that the Report contained no finding of excessive corrosion was "an important factor in Plaintiffs' decision to further consider purchasing of this vessel." (Tisdale Aff. ¶ 5; Linas Dep. at 52–54; Daskalakis Dep. at 20–21.)

The plaintiffs were subsequently permitted to perform an independent inspection of the vessel, which occurred in Silvertown, England, on March 4 and 5, 2000. (Def.'s Rule 56.1 St. ¶ 9.) The plaintiffs claim that at the time this inspection was performed the vessel's cargo holds were loaded with cargo and bulldozers were in operation, so an inspection of the cargo holds was not possible. (Tisdale Aff. ¶ 6.) The plaintiffs' surveyor issued a report indicating that there was no apparent frame damage to the upper 2/3ds of the frames, but that he could not observe the lower parts; and that overall the vessel was "strong" but "needs 'love' ". Report dated March 5, 2000, at 2, 4, attached as Ex. 8 to Tisdale Aff.

On or about March 23, 2000, Amethyst entered into a Memorandum of Agreement (the "MOA") with Tide Line for the purchase of the M/V Amethyst by Tide Line or a company to be nominated by Tide Line in its discretion. (Def.'s Rule 56.1 St. ¶ 4; Memorandum of Agreement, attached as Ex. 9 to Tisdale Aff., at 1.) The Agreement states that "[t]he Buyers have accepted the vessel after superficial inspection at Silvertown on the 4th and 5th

March, 2000 and this transaction is outright subject to the conditions of this agreement. The Buyers have waived their right to inspect the Vessel's records." Memorandum of Agreement ¶ 4. The Agreement also states that:

> the vessel shall be delivered with present class free of recommendations. The Sellers shall notify the Classification Society of any matters coming to their knowledge prior to delivery which upon being reported to the Classification Society would lead to the withdrawal of the vessel's class or to the imposition of a recommendation relating to her class.... If the cost of repairs to rectify above recommendations is in excess of U.S. $5,000 ... the Sellers are to rectify such deficiencies and deliver the vessel free of Class recommendations in accordance with the requirements of this contract.

*Id.* ¶ 11 (original emphases omitted).

The Agreement contains an arbitration clause, which states that "[i]f any dispute should arise in connection with the interpretation and fulfillment of this contract, same shall be decided by arbitration in the city of London, Law of England to Apply." *Id.* ¶ 15 (original emphases omitted). The Agreement states that "[t]his contract shall be subject to the law of the country agreed as place of arbitration." *Id.*

After the MOA had been executed, two agents of the plaintiffs allegedly went on board the M/V Amethyst in Canada and observed what they believed to be serious structural damage to the vessel, which was inconsistent with the indications in the ABS Survey Status Report. (*See* Tisdale Aff. ¶ 8.) The plaintiffs allegedly photographed these alleged damages, documented them, and then presented them to Amethyst and Combine, arguing that Amethyst and Combine had a duty under the MOA to report these damages to the defendant because the damages were substantial enough that they would lead to the withdrawal of the vessel's class or to the imposition of a recommendation relation to her class. (*Id.* ¶ 9.) Amethyst and Combine allegedly refused to convey any such information to the defendant. (Id. ¶ 11.)

The plaintiffs subsequently presented this same evidence of substantial damage to the vessel directly to the defendant in its Piraeus Office. (Def.'s Rule 56.1 St. ¶ 19; Tisdale Aff. ¶¶ 11–12.) In their correspondences with the Piraeus office, the plaintiffs allege that they urged the defendant to inspect the vessel for such damages on its next inspection, which was set to take place for a check of the poop deck prior to the closing of the sale of the vessel. (Pl.'s Rule 56.1 St. ¶ 18.) The plaintiffs allege that they were told by the Piraeus office that the problems they had raised would be taken into consideration. (Pl.'s Rule 56.1 St. ¶ 17.)

On May 9 and 10, an ABS surveyor performed a survey of the M/V Amethyst in Algeciras, Spain. (Def.'s Rule 56.1 St. ¶ 14; Tisdale Aff. ¶ 13.) The surveyor, who was a member of the defendant's Madrid office, conducted the survey, and he has testified that he was aware from ABS's Piraeus office of the concerns Tide Line had raised relating to the problems with the vessel. (Deposition of Manuel Castro Torres dated February 20, 2001 ("Castro Dep."), at 17–19.) The surveyor testified that he was also prevented from seeing the places where the alleged damage to the vessel was. (Castro Dep. at 113–14.) On the following day, the ABS allegedly conducted an underwater inspection, which revealed to an ABS certified diver that there was some abnormal movement of the rudder blades, but this movement was not captured on videotape and the defendant did not take any actions to inspect the rudder blades any further. (Pl.'s Rule

56.1 St. ¶ 19.) On May 10, 2000, Mr. Klapanis, the manager of the defendant's Piraeus Office executed a Confirmation of Class Certificate for the M/V Amethyst free of recommendations, which was issued to Combine in Greece. (Pl.'s Rule 56.1 St. ¶ 21; Def.'s Rule 56.1 St. ¶ 22.)

Once this certificate had been issued, the closing on the M/V Amethyst took place on May 11, 2000 in Piraeus, at which time Combine representatives allegedly presented a clean Confirmation of Class Certificate on which the plaintiffs allegedly relied. (Pl.'s Rule 56.1 St. ¶¶ 22–23; *see generally also* Memorandum of Agreement, at 1.) The plaintiffs claim that while they believed there to be damages to the vessel, they estimated these damages to be less than the costs that would have been involved in breaching the MOA, given that they had placed $270,000, or 10% of the purchase price, in deposit for the closing. (*See* Def.'s Rule 56.1 St. ¶ 6; Pl.'s Rule 56.1 St. ¶ 7.)

On May 12, 2000, Tide Line, on behalf of Sealord, directed ABS to carry out complete annual and intermediate surveys of the ship. The same ABS surveyor who had inspected the vessel two days earlier and found it to be free of recommendations found, in this more comprehensive survey, that there was substantial structural damage to the vessel and listed ten pages of recommendations. *See* Report dated May 12, 2000, attached as Ex. 29 to Tisdale Aff. The plaintiffs bore the cost of these repairs, which, according to the plaintiffs, amounted to $1,387,560.80, which was a much higher figure than they had expected from the damage that was allegedly known to them prior to the closing. (Pl.'s Rule 56.1 St. ¶ 32.)

Although the plaintiffs began to seek damages against Combine and Amethyst, these parties ultimately settled for $400,000. (*See* Def.'s Rule 56.1 St. ¶¶ 26–28; Pl.'s Rule 56.1 St. ¶¶ 37–39.) The plaintiffs brought the present action in this Court against the defendant, alleging that the defendant performed negligent inspections of the vessel and negligently issued improper classification certificates, which thereby caused the plaintiffs to enter into the MOA and then consummate the sale, while thereafter having to shoulder all of the costs of repairs in this case. The plaintiffs contend that without this alleged negligence, they would not have had to pay for any repairs to bring the vessel into compliance with the ABS rules and regulations for A1 class certification.

## II.

The first issue is what law to apply to this maritime dispute. The plaintiffs argue for the application of Greek law, while the defendant argues primarily for the application of United Kingdom law.[1] At oral argument, the parties agreed that Cyprus law should not be applied in this case because, while Cyprus has some contacts with the dispute at issue, those contacts are insufficient when compared to the interests of other countries.

Federal maritime choice-of-law provisions govern this case. *See, e.g., Kermarec,* 358 U.S. at 628, 79 S.Ct. 406 (if maritime action had been brought in state court, "reference to admiralty law would have been necessary to determine the rights and liabilities of the parties"); *Pope & Talbot, Inc.,* 346 U.S. at 409, 74 S.Ct. 202 (federal maritime law controls any claim rooted in admiralty); *Sundance*

---

1. The defendant also argued at oral argument that in the event United Kingdom law does not apply, United States law should apply. (Tr. dated 8/29/02.) The defendant has placed little emphasis on this argument, however, and has instead focused its arguments in the briefs and at oral argument on the contention that United Kingdom law should apply.

*Cruises Corp. v. The American Bureau of Shipping*, 7 F.3d 1077, 1079–81 (2d Cir. 1993) (federal maritime choice-of-law provisions governed claims for breach of contract, negligence and gross negligence arising out of improper class certification); *Siegelman v. Cunard White Star*, 221 F.2d 189, 192–93 (2d Cir.1955) (Harlan, J.) (federal court in diversity action concerning a maritime tort applies federal choice-of-law rules including their application to an alleged defense based on a contractual limitation).

■ Federal maritime choice-of-law principles derive primarily from the Supreme Court's decision in *Lauritzen v. Larsen*, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), as subsequently elaborated *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959), and *Hellenic Lines Ltd. v. Rhoditis*, 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970) (collectively, the "*Lauritzen* triad"). The claims in *Lauritzen* were brought under the Jones Act, but the Supreme Court has held that "[t]he broad principles of choice of law and the applicable criteria of selection set forth in *Lauritzen* were intended to guide courts in the application of maritime law generally." *Romero*, 358 U.S. at 382, 79 S.Ct. 468. Under *Lauritzen*, courts are ordinarily directed to examine the following considerations: (1) the place of the wrongful act, (2) the law of the ship's flag, (3) the domicile of the injured party, (4) the domicile of the shipowner, (5) the place of contract, (6) the inaccessibility of the foreign forum, and (7) the law of the forum. *Lauritzen*, 345 U.S. at 583–92, 73 S.Ct. 921. These factors are not, however, exhaustive, and the weight of the various factors can depend upon the particular circumstances of a case. *See, e.g., Rhoditis*, 398 U.S. at 308–09, 90 S.Ct. 1731.

In *Carbotrade S.p.A. v. Bureau Veritas*, 99 F.3d 86, 89–90 (2d Cir.1996) ("*Carbo-*

*trade I*"), the Court of Appeals for the Second Circuit examined a case in many ways similar to the present one. The plaintiff, a charterer of a vessel, alleged that a French classification society had negligently issued classification certificates for the vessel, which the plaintiff allegedly relied upon to indicate that the vessel was seaworthy. The ship subsequently sank while at sea, and the plaintiff claimed that the classification society was partly responsible for the sinking of the vessel due to its negligent inspections and certifications. The Court of Appeals noted that "[u]nlike the typical Jones Act case, which involves a plaintiff seaman and a defendant shipowner, this case involves three different parties: (1) a plaintiff who chartered the vessel, (2) a defendant classification society, and (3) the shipowner, which actually contracted for the services of the classification society but is not a party to this action." *Id.* at 91. In these circumstances, the Court of Appeals found that a number of the *Lauritzen* factors were inapplicable. The fifth factor—the place of contract—was not relevant because, in contrast to *Lauritzen*, there was no direct contractual relationship between the plaintiff and the defendant. Only the non-party shipowner had contracted with the classification society, and the plaintiff was not a party to that contract. *Id.* The Court of Appeals also noted that the sixth factor—the relative inaccessibility of the foreign forum—was more relevant to a forum non conveniens analysis than a proper choice-of-law analysis. *Id.* Finally, the Court of Appeals observed that the seventh *Lauritzen* factor-the law of the forum—was not relevant where, as here, suit was brought in the United States. *Id.* These same considerations apply to the present case.

Although the traditional *Lauritzen* factors identify as factors only the domiciles of the injured party and of the shipowner, the Court of Appeals in *Carbotrade I* noted

that in the circumstances of that case, the domiciles of the injured party and the defendant classification society would have to be considered. The Court of Appeals also reaffirmed that the domicile of the shipowner had some bearing on the analysis because the shipowner was in privity of contract with the classification society, and it was the shipowner who had contracted with the classification society to conduct the investigations and issue the appropriate class certifications. *Id.* In circumstances where the plaintiff was suing a classification society for the negligent issuance of class certifications, and the plaintiff did not have any independent contractual relationship with the classification society but instead allegedly relied upon certifications issued pursuant to a contract between the classification society and a non-party shipowner, the Court of Appeals held that five factors are relevant to a maritime tort choice-of-law analysis: (1) the place of the alleged wrongful act, (2) the law of the ship's flag, (3) the domicile and base of operations of the plaintiff, (4) the domicile and base of operations of the defendant, and (5) the domicile and base of operations of the shipowner. *Id.* The *Carbotrade I* reasoning applies equally to the circumstances of this case—if Amethyst and Combine are identified as the original shipowner, and the plaintiffs as the allegedly injured parties.

■ Applying these factors to the facts in this case, the first factor—the place of the wrongful acts—favors the application of Greek law over the law of the United Kingdom. The first wrong that the plaintiff alleges is the purported negligent inspection of the vessel in August 1999, which indisputably took place in Piraeus, Greece, and which resulted in an allegedly improper class certification and subsequent Survey Status Report that was also issued by the ABS's Piraeus office in Greece. The defendant argues that the 1999 survey is irrelevant because the plain-

tiffs never checked the class records prior to signing the MOA, but the plaintiffs have presented evidence that they were sent a copy of the vessel's ABS Survey Status report during the initial discussions leading to the execution of the MOA, and that they would not have executed the MOA if they had known about problems with the vessel that the August 1999 survey should have revealed. In particular, the plaintiffs allege that they relied on the fact that the Survey Status Report indicated that the vessel had undergone an annual survey within the preceding six months in Piraeus, Greece, at which time no substantial corrosion was found.

The second wrong that the plaintiffs allege arises out of the fact that the defendant performed a negligent inspection of the vessel during the inspection in Algericas, Spain. However, none of the parties argues for the application of the laws of Spain, and Spain has few if any contacts with or interest in this case. Moreover, the plaintiffs argue in large part that the wrongful act was not the negligent inspection *per se* but rather the subsequent issuance of an allegedly negligent and inappropriate Confirmation of Class Certification, without recommendations, on May 10, 2002. According to the plaintiffs, it was this confirmation, rather than the inspection, that ultimately forced the plaintiffs to consummate the purchase of the vessel and sustain the damages, and this Confirmation was issued from the defendant's Piraeus office in Greece. In analyzing a similar claim of negligence, the Court of Appeals in *Carbotrade I* found that the relevant wrongful act occurred where the allegedly defective classification certificates were issued. *Carbotrade,* 99 F.3d at 91.

The defendant argues that the second certification was approved in Houston, Texas, a fact that weighs slightly in favor

of United States law. However, as discussed above, the Survey Status Report was itself issued from the ABS's Piraeus office in Greece, and the plaintiffs allege, in part, a negligent omission on the part of the Piraeus office to follow up on information provided to it concerning the inspection and the condition of the ship. In particular, the plaintiffs allege that it was improper for the Piraeus office to have issued the certificates merely on the basis of the inspection that had been performed, along with an authorization from Houston, and without any further follow-up, given that the office had been informed of the alleged problems with the vessel and indeed had allegedly passed them on to the office in Spain. The plaintiffs thus allege omissions that clearly occurred in Greece, and there is at least a material issue of fact whether the Piraeus office was responsible for not preventing the issuance of the certifications. Moreover, the plaintiffs allegedly relied on the existence of the defendant's certification when they closed on the purchase of the vessel in Greece. By contrast, none of the alleged wrongful acts in this case occurred in the United Kingdom.

The second factor—the law of the ship's flag—supports the position of neither the plaintiffs nor the defendant. The ship indisputedly flies the flag of Cyprus. While the Supreme Court in *Lauritzen* indicated that the law of the ship's flag should ordinarily be given central importance in a maritime choice of law analysis, the Court did so largely out of deference to the principle that "[e]ach state under international law may determine for itself the conditions on which it will grant its nationality to a merchant ship, thereby accepting responsibility for it and acquiring authority over it," 345 U.S. at 584, 73 S.Ct. 921. The ship is not a party in this case, and there are no allegations of wrongs occurring on board the ship. No party has argued for the application of Cyprus law, and there is no evidence that Cyprus has any substantial interest in or contacts with this particular dispute. In these circumstances, this second factor carries much less than its ordinary weight because the connections that Cyprus has to this dispute are outweighed by the many connections that this case has with Greece. *Cf. Carbotrade*, 99 F.3d at 92–93 (devaluing this factor when there were few substantial connections between the state of the ship's flag and the dispute at issue).

The third factor—the domicile and place of operations of the plaintiffs—favors the application of Greek law over United Kingdom law. Of the two plaintiffs in this case, one, Sealord, is a Cyprus corporation, and the other, Tideline, is a Liberian corporation. However, the evidence presented by the parties indicates that Sealord is effectively a shell corporation that is managed and run by Tideline, which has its principal place of business in Piraeus, Greece. Tideline currently manages the M/V Amethyst, and Tideline negotiated the execution of the MOA and the purchase of the vessel as well as the independent inspections and communicated with the defendant concerning the alleged problems with the vessel. Although Sealord is not a Greek corporation, it is clear that it has significant contacts with Greece, in part due to its management by Tideline. By contrast, neither of the plaintiffs has its place of incorporation or its principal place of business in the United Kingdom. The third factor thus favors the application of Greek law.

With regard to the fourth factor—the domicile and place of operations of the defendant—ABS is a New York corporation, with its principal place of business in Houston, Texas, and is therefore domiciled in the United States. The defendant also has a Piraeus office, but the defendant has emphasized, in this regard, that it main-

tains bases of operation in numerous countries around the world. The defendant argues that this factor should therefore be considered neutral. However, in discussing the application of this fourth factor to the alleged tortious conduct of a similar classification society in *Carbotrade I,* the Court of Appeals held that:

> The presence of an office of a defendant in a particular country might not always be sufficient to tip this factor in favor of applying the law of that country. But unlike the typical Jones Act case, wherein a seaman is injured aboard a vessel and the place of the tort is often happenstance, [the defendant classification society's] conduct was out of an office in a country where [the classification society] had chosen to establish itself and thereby become subject to that country's laws.

*Carbotrade,* 99 F.3d at 91–92.

Given the reasoning in *Carbotrade I,* the fourth factor tips in favor of the application of Greek law in this case. By setting up its office in Piraeus, Greece, the defendant purposefully availed itself of the benefits and protections of Greek law, and thereby subjected itself to the application of Greek law. For the reasons discussed above, the Piraeus office played a central role in most of the alleged conduct giving rise to the present action. The same cannot be said for the defendant's offices in the United Kingdom, or of its United States office.

The fifth, and final factor, to consider is the domicile and place of operations of the original shipowner. Prior to the sale to the plaintiffs, the ship was owned directly by Amethyst, a Cyprus corporation, and was managed by Combine, a Greek corporation. To the extent that this factor is relevant to the dispute between the parties in this case, this factor thus also favors the application of Greek law.

In sum, four of the five factors that are relevant to the choice of law analysis in the circumstances this case favor application of Greek law over United Kingdom law, and one factor is neutral with respect to this dispute. An application of the relevant *Lauritzen/Carbotrade* factors therefore indicates that Greek law governs this dispute.

### III.

The defendant argues that the *Lauritzen/Carbotrade* factors discussed above do not exhaust the appropriate choice of law analysis in this case because the MOA contains a choice of law provision, which states that "[t]his contract shall be subject to the law of the country agreed as place of arbitration," and elsewhere states that "[i]f any dispute should arise in connection with the interpretation and fulfillment of this contract, same shall be decided by arbitration in the city of London, Law of England to apply." Memorandum of Agreement ¶ 15. The defendant argues that this provision should alter the choice of law analysis in this case. *Compare, Sundance Cruises,* 7 F.3d at 1081 (applying ordinary *Lauritzen* factors when a choice of law provision in invoices applied New York law and New York would also apply federal maritime choice of law principles in maritime cases); *CTI–Container Leasing Corp. v. Oceanic Operations Corp.,* 682 F.2d 377, 382 n. 8 (2d Cir.1982) (declining to decide whether private contractual choice-of-law clauses are effective in admiralty); *Stoot v. Fluor Drilling Servs., Inc.,* 851 F.2d 1514, 1517 (5th Cir. 1988) (contractual choice-of-law clause effective under admiralty law unless chosen law has no substantial relationship to the parties or the transaction, or chosen state law conflicts with the fundamental purposes of maritime law). The defendant in this case was not a signatory to the MOA, however, and the plaintiffs do not raise

any claims for breach of this contract of sale. The plaintiffs raise only claims for negligence, which sound in tort. The initial issue, in these circumstances, is not the breadth of the arbitration clause or choice-of-law provision in the MOA, and whether these provisions apply to the types of disputes raised in this case, but rather whether the defendants are entitled to invoke this choice of law provision.

■ The defendant cites *Direct Mail Prod. Servs. Ltd. v. MBNA Corp.*, No. 99 Civ. 10550, 2000 WL 1277597 (S.D.N.Y. Sep.7, 2000), a case involving a forum selection provision, for the proposition that it can invoke the MOA's choice of law provision even though it was not a signatory to the contract. In *Direct Mail*, the court held that "a non-party [to a contract] may nonetheless invoke such a forum selection clause if the non-party is 'closely related' to one of the signatories." *Id.* at *3. In particular, "the relationship between the non-party and the signatory must be sufficiently close so that the non-party's enforcement of the forum selection clause is 'foreseeable' by virtue of the relationship between the signatory and the party sought to be bound." *Id.* (internal quotation marks omitted) (collecting cases). A non-party that is an intended beneficiary of a contract can meet this test. *See Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1359 (2d Cir.1993). However, the defendant has not produced any evidence that it was an intended beneficiary of the contract of sale in this case, and there is no basis for the claim that the plaintiffs were in any way motivated to execute the MOA and to submit to its choice of law provisions in order to confer any benefits on the defendant classification society.

The defendant correctly argues that third party beneficiary status is not required in order for a non-party to invoke a forum-selection provision. *See, e.g., Lipcon v. Underwriters at Lloyd's, London,*

148 F.3d 1285, 1299 (11th Cir.1998) (" '[W]hile it may be true that third-party beneficiaries to a contract would, by definition, satisfy [this] requirement[ ] ..., a third-party beneficiary status is not required.' ") (quoting *Hugel v. Corp. of Lloyd's*, 999 F.2d 206, 209 (7th Cir.1993)). Courts have, for example, found that a non-party has a sufficiently close relationship with a signatory to allow the non-party to invoke a choice of law provision in circumstances where the non-party is an alter-ego of the signatory, a successor entity to the signatory, or is owned or primarily owned by the signatory. *See Maritime Ins. Co. v. M/V "Sea Harmony"*, No. 97 Civ. 3818, 1998 WL 214777, at *2 (S.D.N.Y. May 1, 1998). No such close relationship between the original shipowners and the defendant exists or is alleged in this case.

In *Direct Mail*, the court also noted that due to principles of mutuality and fairness, a non-party can sometimes also invoke a forum-selection provision in a contract when defending against "claims [that] ultimately hinge on rights and duties defined by the Agreement." *Direct Mail*, 2000 WL 1277597, at *5. In such cases, the court explained, "principles of mutuality and fairness suggest that defendants should be entitled to assert the forum selection clause contained in that same Agreement in defending those claims." *Id.* (collecting cases). The defendant argues that this same reasoning should apply to choice of law provisions like the one in MOA, and that the plaintiffs' claims ultimately hinge on rights and duties defined by this contract of sale because the plaintiffs allege that it was this contract of sale that ultimately required them to purchase the vessel upon receipt of the allegedly improper classification certificate.

This argument misconstrues the nature of the claims raised by the plaintiffs in this case. The plaintiffs allege that the defen-

dant was negligent in its inspections of the M/V Amethyst and in issuing two allegedly improper classification certifications. The plaintiffs claim that the issuance of these allegedly improper certifications caused them damages, as purchasers of the vessel, which were foreseeable given purchasers' and sellers' common reliance on these certifications in the maritime business and the ordinary assumptions made about the meaning of such certifications in the industry. Hence, the duties that the plaintiffs allege do not derive from the MOA. Rather, the plaintiffs raise claims based on alleged breaches of a duty of care that exists independently of any contractual obligations and that derives, instead, from principles of tort law.

The defendant argues that these claims nevertheless hinge on rights or duties deriving from the contract of sale because, without the contract of sale, the plaintiffs would not have been required to purchase the vessel upon receiving the allegedly improper certification, and, hence, would not have been damaged and would have had no claim. However, this argument establishes only that duties arising from the contract of sale played a role in the line of causation that lead to the alleged damages in this case. The legal basis for the plaintiffs' claims still derives solely from principles of tort law, and in no way depends upon any rights or duties in the contract of sale.

At oral argument, the defendant argued that even if the choice of law provision is not dispositive, it should be considered as a factor in the relevant *Lauritzen/Carbotrade* choice of law analysis as applied to this case. *Carbotrade I* itself suggested, to the contrary, that facts about such contracts are not relevant to a choice of law analysis relating to tort claims involving non-parties to the contract. *Carbotrade*, 99 F.3d at 91. In any event, it is unnecessary to decide this issue in this case, be-cause this single factor purportedly favoring United Kingdom law, which arise out of a contract that was never signed by the defendant or by any other party that is sufficiently closely-related to the defendant, is clearly outweighed by the many factors that argue in favor of the application of Greek law in this case.

For all of these reasons, the defendant's arguments for the application of United Kingdom law on the basis of the choice of law provisions in the MOA is without merit.

## IV.

■ In light of the foregoing choice of law analysis, the dispositive issue in this motion is whether this case should be dismissed as a matter of law under Greek law. Under the Federal Rules of Civil Procedure, questions of foreign law are treated as questions of law. *See* Fed. R.Civ.P. 44.1; *Seetransport Wiking Trader Schiffahrtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 29 F.3d 79, 81 (2d Cir.1994); *Carbotrade S.p.A. v. Bureau Veritas*, No. 92 Civ. 1459, 1998 WL 397847, at *2 (S.D.N.Y. July 16, 1998) (*"Carbotrade II"*). In determining foreign law, the Court "may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed.R.Civ.P. 44.1. Accordingly, foreign law should be argued and briefed like domestic law. As with domestic law, judges may rely on both their own research and the evidence submitted by the parties to determine foreign law. *Batruk v. Mitsubishi Motors Corp.*, Nos. 94 Civ. 7593, 94 Civ. 8677, 1998 WL 307383, at *3 (S.D.N.Y. Jun.10, 1998).

Both parties have submitted extensive materials on Greek law, including expert reports and supporting documents. The

plaintiffs have submitted affidavits, declarations and other materials by Anthony Antapassis, the President and a Professor of Law at the Law School of Athens and President of the Hellenic Maritime Law Association, and the defendant has submitted similar materials by Theodoros V. Sioufas, a Greek attorney who was admitted to the Athens Bar in 1966 and has 35 years of experience in commercial, shipping, contracts and inheritance matters. (*See. e.g.,* Declaration of Anthony M. Antapassis dated October 22, 2001, at 1 ("Antapassis Decl."); Declaration of Theodoros V. Sioufas received August 19, 2002 ("Sioufas Decl.").) In addition, each party has fully-briefed the issues relevant to this case under Greek law and has submitted a number of subsequent affidavits and English translations of some of the foreign opinions and other materials relevant to this case.

Applying Greek law to this case, the plaintiffs' claims cannot be dismissed on this motion for summary judgment.[2] Under Greek substantive law, tort liability is governed by article 914 of the Greek Civil Code, which provides that "[a] person who through his fault has caused in a manner contrary to the law prejudice to another shall be liable for compensation." *See Carbotrade, S.p.A. v. Veritas,* No. 92 Civ. 1459; 1999 WL 714126, at *14 (S.D.N.Y. Sep.14, 1999) ("*Carbotrade III* "), *aff'd* 216 F.3d 1071, 2000 WL 821853 (2d Cir.2000). The prerequisites for tort liability under this section are (1) an act (or omission) of a person, (2) that is unlawful, (3) negligence (or intent) on the part of the person, (4) damages and (5) an adequate causative link between the act (or omission) and the

---

**2.** There is an initial question whether the *Lauritzen/Carbotrade* test determines what substantive law to apply to a case, including what choice of law provisions, or whether the test points directly to the substantive laws of a nation without recourse to its choice of law provisions. In *Carbotrade I,* the Court of Appeals used language in applying the *Lauritzen* factors that suggests that the latter view is the correct view, and that the *Lauritzen/Carbotrade* test. points simply and directly to a nation's substantive law to apply to a given controversy, without recourse to its choice of law provisions. *See Carbotrade II,* 1998 WL 397847, at *3 n. 1.

In any event, this dispute is immaterial to the issues raised in this motion because an application of Greek choice of law provisions to the claims raised in this case would require the application of Greek substantive law as well. Article 26 of the Greek Civil Code provides that "[o]bligations arising from tort shall be governed by the country where the tortious act occurred." Professor Antapassis has explained that:

As regards the case where the tortious acts take place in more than one country or take place in the same country but their consequences take effect in another country, several views have been maintained. According to the "place of the act" view, the place

where the act was committed is preponderant. According to the "place of the consequence" view, the place where the last consequence of the action was completed is that [sic] counts According to the "composite" view, each of the place of the act and the place of the consequence have an equal weight; thus, the person who sustained the damage has an option. Finally, the "most significant place" view looks to the place where the most significant part of the tortious act, as a whole, occurred.

Declaration of Anthony M. Antapassis dated October 22, 2001, at ¶ 1 ("Antapassis Decl.") (internal footnotes omitted). Although there is some apparent disparity in these views, "Greek courts have in fact placed great significance on the place where the alleged tortious act was actually committed, and less significance on the place where the loss was manifested." *Carbotrade II,* 1998 WL 397847, at *4. In this case, for the reasons described above, a number of the tortious acts alleged took place in Greece or in Greek territorial waters, and Greece was the place where the most significant part of the alleged tortious acts as a whole occurred. *See also* Antapassis Decl. ¶ 3 (indicating that under Article 26 of the Greek Civil Code, Greek substantive law would apply to the tort claims raised in this case).

damages suffered. *Id.; see also* District Court of Athens Decision No. 26/1977; *see generally* Multi–Member Court of First Instance of Piraeus Judgment No. 4341/1998 (*"Entrust Faith"*).

■ There is no dispute among the parties that this case presents material issues of fact relating to whether there were negligent or intentional acts on the part of the defendant that caused the plaintiffs damages. The defendant argues that it is nevertheless entitled to summary judgment, first, on the ground that the alleged acts or omissions were not "unlawful" in a sense needed to establish tort liability under Greek law, and, second, on the ground that there was not an "adequate causative link" between these alleged acts or omissions and the damages alleged in this case.

With regard to whether the acts and omissions alleged in this case were "unlawful" under § 914 of the Greek Civil Code, it is now well-accepted that there is "no requirement that a certain rule of law be violated but it suffices that the act contravenes the general spirit of justice or the commands of the legal order." *Carbotrade II,* 1998 WL 397847, at *6; *see also* Antapassis Decl. at 15–16 & n.26 (collecting authorities). This general spirit is contravened "whenever there is a violation of the general rules of safety and care and the general principles of good faith and decent business usages." *Carbotrade II,* 1998 WL 397847, at *6; *see also* Greek Civil Code Arts. 228, 330; Antapassis Decl. at 15–16. This spirit is also contravened when there is a violation of the spirit of good faith and good morals that is part of Greek law, and that generally requires each person to exercise sincerity and honesty in required dealings. (*See* Antapassis Decl. at 16–17.)

■ Two courts have specifically addressed the issue whether a classification society can be liable to the purchaser or charterer of a vessel for damages caused by the issuance of a false or improper certification. Both have answered the question in the affirmative. In *Patagonian Pride,* the Court of Appeal of Piraeus, Maritime Division, recently found that it was error to dismiss as a matter of law a claim against a classification society, which was brought pursuant to article 914 of the Greek Civil Code and was based on the allegation that the purchaser of a ship was misled in the purchase of the ship by a class maintenance certificate and the measurements of the ship's plating contained therein. *See* The Court of Appeal of Piraeus (Maritime Section) No. 397/2002 ("Patagonian Pride") (June 13, 2002). While the Court found that there was an error in the calculation of the damages sought, and that the claim should have been dismissed, the Court of Appeals also found that, given the plaintiff's allegations under the prevailing theory of adequate cause, the plaintiff had adequately pleaded that there was an objectively competent and appropriate cause of the plaintiff's injury. The Court of Appeals also found that such allegedly false certifications could violate the provision of Law 2251/1995 of the Greek Civil Code, which is a consumer protection statute, because, under that provision, the person who offers products or services is liable for every damage the party responsibly caused during the provision of services. The reasoning in *Patagonian Pride* supports the plaintiffs' arguments and the opinion of Professor Antapassis that the plaintiffs' claims cannot be dismissed as a matter of law in this case.

In *Carbotrade III,* this Court similarly held that under Greek law:

> A classification society has a duty to maintain and observe good faith and decent business usages during the execution of its undertakings. Those persons who can prove that they were damaged by the failure of the classification society

to carry out its duties and who can show an "adequate causal link" between that breach of the duty of care and that person's injury can recover from the classification society. 1999 WL 714126, at *14. The Court arrived at this conclusion concerning the scope of Article 914 of the Greek Civil Code after receiving extensive materials on Greek law, including expert reports and supporting documents, and after conducting an evidentiary hearing on Greek law in which many of the same legal issues raised in this case were discussed. *See Carbotrade II,* 1998 WL 397847, at *2.

The defendant argues that the reasoning in the above cases is inapplicable to this case because the plaintiffs in this case already knew about all of the alleged damages that were later discovered and, hence, could not have reasonably relied upon the defendant's second allegedly negligent classification certificate. The defendant also argues that there were a number of intervening events that interrupted the chain of causation alleged by the plaintiffs. However, the plaintiffs clearly allege that they reasonably relied on certifications resulting form the initial August 1999 inspection in negotiating and then entering into the MOA, and the plaintiffs have submitted sufficient evidence in support of this contention to survive a motion for summary judgment. Whether there actually was any such reasonable reliance and whether any such reliance was the adequate cause of any damages in this case are material issues of fact.

Moreover, with regard to the second certificate, the plaintiffs allege in main part that they were damaged because, once they had entered into the contract of sale, they were required to purchase the vessel upon receipt of an appropriate classification certificate. They allege that improper certifications caused them to have to consummate the purchase of a vessel that they knew to be defective or suffer extensive damages from failure to comply with the terms of the MOA. They allege that, having been informed of alleged defects in the vessel, it was a breach of good faith and decent business usage for ABS to give the certification without which the sale would not have closed. These allegations raise material issues of fact with respect to good faith and decent business usages as well as adequate cause that cannot be decided on a motion for summary judgment.

Finally, while under Greek law, the decisions of other courts are not technically binding and instead have only persuasive authority, *see, e.g.,* Antapassis Aff. at 24; Sioufas Decl. at 6, the defendant has not pointed to any authorities in which a court applying Greek law has found that a certification society cannot be liable for negligence under the facts alleged in this case. The plaintiffs' claims cannot be dismissed as a matter of law.

In sum, the defendant has not identified any basis in Greek law that would warrant the dismissal of the plaintiffs' claims as a matter of law in light of the material issues of fact that remain in this case.

## CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment is denied.

**SO ORDERED.**