REINO DE ESPAÑA, on its own behalf, and as trustee, Plaintiff–Counter–Defendant–Appellant,

v.

The AMERICAN BUREAU OF SHIPPING, INC., ABSG Consulting Inc. f/k/a ABS Marine Services, Inc., ABS Group of Companies, American Bureau of Shipping, Defendants–Counter–Claimants–Appellees.

No. 10–3518–cv.

United States Court of Appeals, Second Circuit.

Argued: Nov. 14, 2011.

Decided: Aug. 29, 2012.

Abraham D. Sofaer, Palo Alto, CA (Juan A. Anduiza, Brian D. Starer, Samuel Spital, Corrine Irish, Squire, Sanders & Dempsey LLP, New York, NY, on the briefs), for Plaintiff–Counter–Defendant–Appellant.

Jeffrey R. Coleman (Norman C. Kleinberg, Steven A. Hammond, Daniel H. Weiner, Peter A. Sullivan, Jason C. Benton, Hughes Hubbard & Reed LLP, John E. Grimmer and Brad Gandrup, Jr., John Grimmer & Associates, New York, NY, on the brief), for Defendants–Counter–Claimants–Appellees.

Thomas A. Telesca, Ruskin Moscou Faltischek, P.C., Uniondale, N.Y. (on submission), for Amici Curiae Oceana and the Natural Resources Defense Counsel.

Before: WALKER, RAGGI, and LIVINGSTON, Circuit Judges.

LIVINGSTON, Circuit Judge:

In November 2002, the oil tanker *Prestige* sank off the northwestern coast of Spain, releasing large quantities of oil into the ocean. Plaintiff–Counter–Defendant–Appellant Reino de España ("Spain" or "Plaintiff") alleges that this oil, on washing up on the Spanish coastline, caused serious environmental and economic damage to Spain and its citizens. Spain, in reaction to the alleged effects of this marine casualty, brought suit against Defendant–Counter–Claimant–Appellee American Bureau of Shipping ("ABS") and its subsidiaries (collectively, "Defendants").

ABS is a classification society—an organization that, as relevant to the present appeal, is contracted by shipowners regularly to survey their vessels for compliance with ABS's requirements on, *inter alia,* structural soundness. ABS, one of the world's leading classification societies, is engaged to inspect (or "class") thousands of vessels worldwide. One such vessel was the ill-fated tanker *Prestige,* which was classed by ABS for its entire working life until its casualty.

Spain alleges that by virtue of the surveys it conducts, ABS (like other comparable classification societies) forms a crucial link in the "maritime safety chain," by which a range of parties, from individual sailors all the way to the world's coastal nations as a whole, are protected against accidents, shipwrecks, pollution, and the like. In particular, Spain alleges that it

and other nations like it are not in a position to inspect the seaworthiness of every vessel passing through their waters, and rely on classification societies to ensure the seaworthiness of those vessels. More precisely, Spain argues that ABS owes a duty in tort to perform its classification surveys with due care not simply to the vessel's owner who contracted for the survey (or to the insurers of the vessel and its cargo), but to third-party coastal nations generally.

Though this Court has previously suggested that "a shipowner is not entitled to rely on a classification certificate as a guarantee to the owner that the vessel is soundly constructed," *Sundance Cruises Corp. v. Am. Bureau of Shipping,* 7 F.3d 1077, 1084 (2d Cir.1993), we there distinguished the situation of "a suit brought by an injured third party who relied on the classification ... certificate[ ]," *id.* We have not decided the question whether a classification society can be held liable to a third party for negligent conduct in connection with a classification survey. That said, Spain concedes in the present appeal that the "policy interests" described by the *Sundance Cruises* Court "justify[ ] an exemption for classification societies from the general rule of negligence liability," Appellant's Br. 39; *see also id.* at 30 (same). Spain maintains, however, that such interests "do not ... extend to *reckless* conduct," *id.* at 39 (emphasis added). Thus, Spain argues, because the claim here is that ABS was not simply negligent but reckless in its actions that led to the wreck of the *Prestige,* ABS is not shielded from liability to third parties such as Spain who putatively suffered harm as a result of those actions. The district court, however,

did not agree. Rather, applying U.S. maritime law, the court concluded first that Spain was outside the (quite limited) set of parties to whom a classification society might normally be liable in tort for conduct relating to its surveys. Moreover, it held that reckless conduct such as alleged here would still not give rise to tort liability to a third party such as Spain, absent a preexisting specific relationship between Spain and the society of a sort not present here. The district court therefore granted summary judgment to Defendants, from which Spain now appeals.

We conclude that we need not resolve the question whether a classification society may be held liable in tort to a third party such as Spain for reckless conduct in connection with the classification of vessels.[1] Rather, we assume *arguendo* for purposes of this appeal that Defendants did owe the claimed duty to Spain. In our view, Spain has nonetheless failed to adduce sufficient evidence to create a genuine dispute of material fact as to whether Defendants *recklessly breached* that duty such that their actions constituted a proximate cause of the wreck of the *Prestige.* We therefore AFFIRM the district court's grant of summary judgment to Defendants, albeit on alternative grounds.

## BACKGROUND

### I. Facts

1. Classification Societies and Classification Surveys

The *Prestige* was an 800–foot long, 40,-000–gross–ton oil tanker, first launched in 1976.[2] From that time until it sank in November 2002, the *Prestige* was classified

---

1. Because Spain does not argue that classification societies may be held liable to third parties for negligence, we do not address that question either. *See Norton v. Sam's Club,* 145 F.3d 114, 117 (2d Cir.1998).

2. The facts set out here, drawn largely from the parties' evidentiary submissions in the district court, are undisputed except where otherwise noted.

(or "classed") by ABS, a not-for-profit corporation founded in 1862 and one of the leading classification societies in the world. Classification societies such as ABS, *inter alia*, establish rules for the design, construction, and continued structural and mechanical fitness of vessels that they class, and certify that, at minimum, a vessel is "in class," or in compliance with the applicable rules and requirements of the society. Such a certification is embodied in a "classification" (or "class") certificate.[3] ABS is paid for these services by the vessel's owner.

As relevant here, ABS typically classes vessels on a five-year survey cycle. This cycle, broadly speaking, consists of one survey performed every five years (the "Special Survey"), an "Intermediate Survey" halfway through the cycle, and "Annual Surveys." The Special Survey, unsurprisingly the most extensive, includes direct inspection of the interior of a ship's structure (especially, in an oil tanker, the vessel's ballast and cargo tanks) for corrosion and fatigue. The inspection involves examination of the structure both visually and through ultrasonic measurement of the thickness of the hull and interior bulkheads (known as "gauging"). ABS directs the owner to make repairs to the vessel as required to satisfy ABS requirements. If these repairs are completed to the surveyor's satisfaction, and the vessel otherwise meets the applicable requirements of ABS rules and international conventions, the surveyor recommends the renewal of the class and statutory certificates. ABS reserves the right to reconsider, cancel, or

suspend classification for noncompliance with its rules.

2. SafeHull

At relevant times, in addition to these ABS surveys, a for-profit subsidiary of ABS, known at one point as ABS Marine Services ("Marine Services") and eventually as ABSG Consulting Inc.,[4] offered an additional service to owners of marine vessels—the structural modeling of a computer program known as SafeHull. SafeHull was used, *inter alia*, to assess a given vessel's structure and predict areas in which structural fatigue and corrosion were likely to develop over time, given the vessel's design and age combined with preset parameters for characteristics such as cargo, trading patterns, and the like.

Marine Services offered to undertake SafeHull analyses of vessels at the request of their owners, for a fee, as an optional supplement to the classification and statutory surveys performed by ABS. As relevant to this case, Marine Services performed SafeHull modeling runs in 1996 and 1998, respectively, on oil tankers (the *Alexandros* and *Centaur*) built at the same time to essentially the same plans as the *Prestige*. The *Prestige's* owners, however, never purchased a SafeHull analysis, and ABS did not communicate the results of the *Alexandros* and *Centaur* analyses to the surveyors examining the *Prestige*.

In 2000, after the oil tanker *Erika* sank, ABS proposed that it and other leading classification societies amend their rules to make the type of analysis performed by

**3.** ABS, like other classification societies, also inspects vessels for their compliance with the requirements of various international agreements on maritime safety and the prevention of pollution. ABS performs these inspections (or surveys) on behalf of the nation that holds the registration of the vessel in question (the "flag state"), and issues various "statutory

certificates" to vessels that satisfy the inspection requirements. Class and statutory surveys are typically performed at the same time.

**4.** We refer to this entity as Marine Services for convenience; the name change is not material here.

SafeHull a mandatory part of each classification Special Survey.

### 3. The *Erika* and *Castor* Casualties

The *Erika*, which had been classed by the Italian classification society RINA, was an older, single-hulled oil tanker (like the *Prestige*, albeit much smaller). When the *Erika* sank off the French coast in December 1999, the resultant oil spill attracted significant attention to the potential safety problems posed by such aging tankers. In February 2000, ABS proposed that it and other leading classification societies enact a series of classification rules changes, which—according to an accompanying ABS press release—were "immediately" necessary to adopt in the wake of the *Erika* casualty.[5] As discussed in further detail in our merits analysis below, some of these changes, including the proposal regarding SafeHull, might well have affected the conduct of the final Special Survey of the *Prestige* (which occurred in April and May 2001) had they been adopted prior to that survey; ABS did not, however, secure agreement from the other classification societies to adopt, or adopt and implement, the relevant proposed changes on that timetable, and did not implement any of its proposals unilaterally.

The wreck of the *Erika* was not the only marine casualty in this period that prompted ABS to evaluate classification survey procedures, both generally and with particular application to oil tankers. In late December 2000, the *Castor*, a small tanker classed by ABS, suffered a major structural failure that ultimately required the ship to be abandoned and towed to the nearest port by salvors. ABS, after conducting an extensive inquiry into the causes of the *Castor* casualty, ultimately concluded, in a report issued in October 2001, that certain additional changes in the rules and conduct of ABS classification surveys were required. Specifically, ABS determined that ballast tanks and cargo/ballast tanks on certain older tankers, like the *Prestige*, should be carefully inspected annually. Those changes, as relevant here, were not implemented prior to the *Prestige's* final annual survey in April 2002.

### 4. The Final Surveys (and Casualty) of the *Prestige*

The Fifth (and final) Special Survey of the *Prestige* occurred in Guangzhou, China, from April 2, 2001, to May 19, 2001. The surveyors who conducted the Fifth Special Survey concluded that the *Prestige*, upon the completion of required repairs, satisfied all applicable ABS requirements. Spain's position, which ABS hotly contests, is that these surveyors in fact conducted an inadequate examination of the *Prestige*, and that the inadequacies of the survey, resulting from reckless policy decisions made by senior ABS decisionmakers in the United States, ultimately led to the wreck of the *Prestige* in 2002.

We discuss this dispute further below. *See* Sections II.A–B, *infra.* Regardless, on May 23, 2001, ABS's regional Hong Kong office faxed summaries of the various reports documenting the findings of the Special Survey, and recommending that the *Prestige's* class certificate be re-issued for another five years, to ABS headquarters in Houston; on May 24, 2001, ABS Houston formally re-issued the class certificate.

The final Annual Survey of the *Prestige* occurred in the United Arab Emirates,

---

**5.** ABS claimed in a related feature on the *Erika*, published in March 2000 in ABS's trade magazine, that it was engaging in a systematic review of the survey records of the 900 vessels it classed that were over twenty years old, to ensure that serious problems with those vessels would not go overlooked. It is undisputed that ABS did not ultimately conduct this review in any meaningful way.

from May 15, 2002, to May 25, 2002. Upon the completion of certain required repairs, the ABS surveyor in attendance was satisfied that the *Prestige* should be retained in class, and so indicated on the *Prestige's* class certificate.

It is undisputed that between May and November 2002, ABS surveyors had no further contact with the *Prestige*. Spain contends (and ABS disputes), however, that in August 2002, ABS received, and ignored, a fax message from the *Prestige's* then-master, alerting ABS to grave structural and mechanical problems aboard the *Prestige*. *See* Section II.D, *infra*.

On November 13, 2002, the *Prestige* suffered a severe internal structural failure that ultimately led to its sinking on November 19, 140 miles off the Spanish coast. The wreck of the *Prestige*, which led to the release of· fuel oil into the ocean and thence onto beaches and coastline in Spain, resulted ultimately in the instant lawsuit.

## II. Procedural History

The procedural history that has led to the present appeal is complex, and we summarize for economy only those events relevant here. On May 16, 2003, Spain filed this suit against ABS, alleging violations of Spanish law and breach of a duty of care under U.S. law. Defendants moved for summary judgment on both jurisdictional and merits grounds, which the district court granted, concluding that it lacked subject-matter jurisdiction, on January 2, 2008, *Reino de España v. Am. Bureau of Shipping, Inc.,* 528 F.Supp.2d 455 (S.D.N.Y.2008). That grant of summary judgment was vacated by this Court by summary order on June 12, 2009, *Reino de España v. Am. Bureau of Shipping,* 334 Fed.Appx. 383 (2d Cir.2009). Defendants renewed their motion for summary judg-

ment, and on August 6, 2010, the district court again granted summary judgment to Defendants, applying U.S. maritime law and holding that, in the circumstances present here, Defendants did not owe a tort duty to Spain, *Reino de España v. Am. Bureau of Shipping, Inc.,* 729 F.Supp.2d 635 (S.D.N.Y.2010). The present appeal followed.

## DISCUSSION

■ On appeal, the parties contest the district court's determination that U.S. federal maritime law governs the merits adjudication of Defendants' motion for summary judgment, and the court's grant of summary judgment to Defendants.[6] We review a district court's choice-of-law determination *de novo. Rationis Enters. Inc. of Pan. v. Hyundai Mipo Dockyard Co.,* 426 F.3d 580, 585 (2d Cir.2005). Our review of the grant of a motion for summary judgment is also *de novo,* and considers whether, drawing all inferences and taking all facts in the light most favorable to the non-moving party, a genuine dispute exists as to any material fact. *Carbotrade S.p.A. v. Bureau Veritas,* 99 F.3d 86, 89 (2d Cir.1996). We begin with choice of law.

## I. Choice of Law

■ As an initial matter, we agree with the parties that maritime choice-of-law rules apply to the tort claims before us. Spain alleged in its complaint that it was seeking redress for vast harm to the marine and coastal environment of northwestern Spain caused by the release of oil that occurred when the *Prestige* sank on the high seas. As such, Spain's complaint satisfies the traditional "locality" requirement for admiralty tort jurisdiction. *See Jerome B. Grubart, Inc. v. Great Lakes*

---

**6.** Defendants pursued counterclaims in the district court, but withdrew those counterclaims without prejudice following the district

court's grant of summary judgment to Defendants; the counterclaims are not at issue on appeal.

*Dredge & Dock Co.,* 513 U.S. 527, 531–534, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995); *East River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 863–864, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986).[7] "With admiralty jurisdiction comes the application of substantive admiralty law." *East River,* 476 U.S. at 864, 106 S.Ct. 2295. And this "general maritime law, as developed by the judiciary," *id.,* includes maritime choice-of-law rules, *Romero v. Int'l Terminal Operating Co.,* 358 U.S. 354, 382–383, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959).

Maritime choice of law, the Supreme Court teaches, involves eight possible factors (the *"Lauritzen* factors"), to be considered in an interest analysis:

(1) the place of the wrongful act; (2) the law of the ship's flag; (3) the domicile of the injured party; (4) the domicile of the shipowner; (5) the place of the contract; (6) the inaccessibility of the foreign forum; (7) the law of the forum; and (8) the shipowner's base of operations.

*Carbotrade,* 99 F.3d at 90 (citing *Hellenic Lines Ltd. v. Rhoditis,* 398 U.S. 306, 309, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970); *Romero,* 358 U.S. at 382, 79 S.Ct. 468; *Lauritzen v. Larsen,* 345 U.S. 571, 583–592, 73 S.Ct. 921, 97 L.Ed. 1254 (1953) (footnote omitted)). Because Plaintiff here did not sue the shipowner—but rather brought its action against a classification society and subsidiaries—we also consider Defendants' domicile and base of operations as a factor. *Carbotrade,* 99 F.3d at 91. In addressing these factors, we emphasize "choosing the law of the state with the most substantial and continuing contacts" with the events giving rise to the claim. *Id.*

In the circumstances of the present case, we consider the law of the flag, the domiciles and bases of operations of the injured party, the shipowner, and the defendant, and the place of the alleged wrongful act.[8] It is undisputed that the *Prestige* was flagged in the Bahamas; that the injured party is domiciled in Spain, the shipowner domiciled in Liberia, and the ship operator domiciled in Liberia but based in Greece; and that ABS and its subsidiaries are United States corporations with headquarters in the United States. The "place of the wrongful act is not where the vessel sinks, but where the negligence [or recklessness] occurs," *Rationis,* 426 F.3d at 587 (citing *Carbotrade,* 99 F.3d at 91)—here, allegedly the United States. Thus, while several of the *Lauritzen* factors point in several different directions, the domicile of defendants and the place of the wrongful act clearly favor the application of American law; indeed, we have said that "it is the state where the negligence occurs that has the greatest interest in regulating the behavior of the parties." *Id.*

Defendants argue that under these circumstances, the law of the flag should control. But we said in *Carbotrade* that

---

7. In *East River,* the Supreme Court reserved the question whether the additional "maritime nexus" prerequisite for admiralty tort jurisdiction applies when a tort occurs on the high seas. 476 U.S. at 864, 106 S.Ct. 2295. We have not resolved that issue, nor need we do so in this case; "[w]ere there such a requirement, it clearly was met here, for [the *Prestige* was] engaged in maritime commerce, a primary concern of admiralty law." *Id.*

8. Here, since "no direct contractual relationship exists between the plaintiff and the defendant ... the place of the contract ... is not involved in our analysis." *Carbotrade,* 99 F.3d at 91. Nor is there any contention that a New York court is incapable of applying foreign law in this case, rendering any potential inaccessibility of a foreign forum irrelevant. *Rationis,* 426 F.3d at 587. And "this Court has considered the law of the forum generally of little relevance in United States courts." *Id.*

Whatever significance law of the flag may have in cases where the ship or its owner is a party and where other factors fail to point clearly to another jurisdiction's law, we see no reason to apply the law of the flag here in preference to that of another jurisdiction whose ties are more pertinent to the dispute, especially given the fact that neither the ship nor the owner is a party.

99 F.3d at 92–93. Here, of course, the shipowner is not a party to the case; and Spain's argument that it was Defendants' wrongful conduct in the United States that led to the sinking of the *Prestige* gives the United States ties to the litigation that are both obvious and more pertinent than the fact that the *Prestige* was Bahamian-flagged at the time that it sank.

Defendants argue that Spain's focus on putative wrongful conduct in the United States is a mere litigation tactic. *Rationis* makes clear, however, that the place of the wrongful act, for choice-of-law purposes, is controlled by plaintiff's allegations in its complaint, see 426 F.3d at 587–588. And while there are obvious tactical advantages for Spain if U.S. law applies, rather than the laws of a jurisdiction with more restrictions on the potential liability of a classification society in a case of this kind, there are risks too. As counsel for Spain stated at argument on choice-of-law before the district court, "We'll rise or fall on proving . . . wrongful conduct in the United States, in [ABS] headquarters. . . ." J.A. 3343 (48:20–22).[9]

In light of all these considerations, we agree with the district court that the *Lauritzen* factors indicate that this action should be governed by the maritime law of the United States.

## II. Merits

■ On the merits, the district court granted summary judgment to Defendants because in the court's view Defendants did not owe a tort duty to refrain from reckless conduct, in performing classification services, to coastal nations such as Spain, absent a pre-existing relationship between the parties not present here. *See* 729 F.Supp.2d at 642–646. As one might expect, the parties on appeal hotly contest the merits of this holding; we, however, need not and do not resolve the question. Even assuming *arguendo* that in the proper circumstances ABS and its subsidiaries could be liable to a coastal nation like Spain for reckless conduct, a matter on which we express no opinion, we hold that Spain has not adduced sufficient evidence to allow a reasonable jury to conclude that they should be held liable to Spain in *this* case. We therefore affirm the district court's grant of summary judgment to Defendants on this alternative ground.

To prove recklessness, as characterized by Spain on appeal, a plaintiff must show at least "that the defendant . . . disregarded[ ] an unjustifiably high risk of harm to another caused by the defendant's actions . . . that was *obvious* and thus should have been known to the defendant." Appellant's Br. 35–36 (citing *Farmer v. Brennan*, 511 U.S. 825, 836, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). In the Statement of Facts of its opening brief on appeal, Spain discusses several categories of evidence that it contends, in the final sentence of the body of that brief, "raise[ ] genuine issues of material fact about whether ABS was reckless," Appellant's Br. 57. We therefore consider whether the evidence in question could create a jury question re-

---

9. We note also that Spain itself is requesting that U.S. rather than Spanish law apply in this case, and that it would be somewhat ironic to disregard this request in the name of honoring the sovereign interests of Spain.

garding recklessness, discussing each category in turn.

## A. Proposed Changes to Classification Rules

We begin with the classification rules changes put forward by ABS in February 2000, following the *Erika* casualty. ABS proposed that the major classification societies jointly adopt a series of reforms to the classification rules, especially those applicable to older tankers. Some of ABS's proposed changes were rejected by the other societies, or tabled for further discussion; some were adopted in more limited form; and some were adopted and set for future phase-in. No proposals were adopted and immediately implemented; Spain, emphasizing that ABS, in its press release detailing the proposals, stated that classification societies "need[ ] to immediately impose the following requirements," J.A. 881 (internal quotation marks omitted), implies that ABS was reckless in failing to do so. Spain points to three proposed rules changes in particular as relevant to the wreck of the *Prestige*.

### 1. Requiring Annual Inspections of Ballast Tanks

The first proposed change would have required an internal inspection of all ballast tanks at each annual survey of a vessel after that vessel was fifteen years old. This change was adopted only in part,[10] and the parties do not dispute that the structural failure aboard the *Prestige* that eventually led to the sinking of the vessel began in a tank that was not inspected at the *Prestige's* final annual survey in 2002. The problem for Spain, however, is that

even if fully adopted and implemented prior to the 2002 survey, this rule change *would not have mandated* an inspection of that tank.

As Spain admitted in its Response to Defendants' Rule 56.1 Statement in the district court, the *Prestige* had tanks for solely carriage of cargo, tanks dedicated to saltwater ballast and tanks designated for the carriage of either cargo or ballast (so-called "cargo/ballast tanks"). J.A. 2477. And as Spain further noted in that same Response, J.A. 2487, the ABS survey rule definitions, at all relevant times, expressly distinguished between ballast and cargo/ballast tanks, *see* J.A. 2622.

The rule change at issue, as proposed by ABS, applied only to *ballast* tanks, rather than cargo/ballast tanks, J.A. 882, 3311, and as adopted applied only to a more limited subset of ballast tanks, J.A. 3311. *Cf.* J.A. 103 (Plaintiff's Amended Complaint) (alleging that after the *Erika* casualty, ABS instituted "a requirement that water ballast tanks adjacent to tanks with heating coils" receive annual internal inspections). But Spain's theory of the *Prestige* casualty is that the casualty ultimately resulted from the failure of the "longitudinal bulkhead between the ... No. 3 center *cargo* oil tank and No. 3 starboard *cargo/ballast* wing tank." Appellant's Br. 7 (emphases added); *see also* J.A. 2488 (Spain Response to ABS 56.1 Statement) (same). We thus fail to see how a requirement that dedicated water ballast tanks receive annual inspections, even if fully in place at the time of the 2002 survey, would have made a causal difference with respect to the sinking of the *Prestige*.[11]

---

**10.** The rule as adopted required annual internal inspection only of ballast tanks that were adjacent to cargo tanks with heating coils.

**11.** Indeed, Spain contended in its Rule 56.1 Statement below that the surveyor in 2002 conducted a faulty inspection because, (1) in

certain circumstances ABS rules required that a cargo/ballast tank be treated *as if it were* a ballast tank, and (2) in those circumstances, such a tank was required to be inspected at an annual survey, but (3) the surveyor failed to follow ABS rules and inspect

To be sure, the final report of the ABS investigation into the *Castor* casualty, issued in October 2001, concluded that ABS rules had erred in treating cargo/ballast tanks less stringently than dedicated ballast tanks, and recommended that both types of tanks be inspected at each annual survey. J.A. 967–968. At minimum, however, we do not think that a reasonable jury could conclude that ABS was reckless merely by failing to both adopt and implement such a rule change between October 2001 and the final annual survey of the *Prestige* in May 2002.

### 2. Requiring Two Surveyors at Special Surveys

Second, ABS proposed that two surveyors be present at all Intermediate and Special Surveys, beginning with the Third Special Survey. It is undisputed that this proposal was adopted with respect to tankers of the size of the *Prestige,* and that the revised rule went into effect on July 1, 2001; it is also undisputed that no more than one surveyor at a time was present for the Fifth Special Survey of the *Prestige,* which occurred in May 2001. Spain implies that the failure to adopt this rule change immediately (such that it would have been in effect at the time of the 2001 Special Survey) was reckless. We are unpersuaded.

Spain has not advanced evidence, beyond the rule-change proposal itself and the phrasing of the accompanying press release, that conducting Intermediate or Special Surveys without a two-inspector requirement posed an obvious and unjustifiable safety risk. Moreover, in this instance ABS *adopted and implemented* the proposal at issue, which rather weakens any suggestion that ABS disregarded such

a risk if present. True, ABS did not implement the rule-change for at least a year after adoption, but we do not think that *any* delay in implementation of even a necessary change in safety rules is reckless per se; and Spain points us to no evidence in *this* record (and we have found none) from which a reasonable jury could conclude that the particular delay in implementation at issue here was even wrongful, much less reckless.

### 3. Mandating Use of SafeHull (or its Equivalent)

Finally, ABS proposed mandating the inclusion of certain "Condition Assessment Program" requirements, including a structural fatigue assessment, at the Third Special Survey and each Special Survey thereafter. Spain asserts, and ABS does not contest, that this change would have required that all existing vessels receive a SafeHull analysis (or, presumably, that of an equivalent program) once they reached fifteen years of age. This change, if immediately adopted and implemented, would have applied to the *Prestige* when it underwent its Fifth Special Survey in 2001. It is undisputed that the change was not adopted.

But the failure to adopt and immediately implement this proposal, however, could not be found, on this record, to constitute recklessness on the part of ABS. As before, Spain has adduced *no* evidence, beyond the bare fact of the proposal itself and its companion press release, that ABS proposed requiring SafeHull for surveys of existing vessels because surveys without SafeHull posed an obvious and unjustifiable safety risk. In such circumstances, a jury could reach the conclusion that ABS

---

that tank accordingly. J.A. 2487. It is undisputed that the 2002 survey occurred outside the United States; Spain does not argue on appeal that any putative failure to follow ABS

rules in the conduct of that survey implicated a breach of duty on the part of ABS personnel within the United States.

acted in conscious disregard or indifference to such risk only by acting "solely on its own conjecture or surmise." *Bryant v. Maffucci,* 923 F.2d 979, 985 (2d Cir.1991).

We note that on appeal ABS asserts, and Spain does not contest, that as of February 2000, when ABS's proposal was made, no classification society then used a program like SafeHull in classification surveys of built vessels, let alone *required* the use of such a program. Conformity to industry custom and practice, while not alone dispositive, is certainly relevant to a recklessness analysis, and cuts strongly against Spain here. Spain rightly notes that, standing alone, "[m]ethods employed in any trade, business or profession, however long continued, cannot avail to establish as safe in law that which is dangerous in fact." *Tug Ocean Prince, Inc. v. United States,* 584 F.2d 1151, 1156 (2d Cir.1978). But this merely begs the question of whether, at the relevant time, it was obvious that the failure to require the use of SafeHull or its equivalent was "dangerous in fact." Since Spain has not introduced sufficient evidence to allow a reasonable jury to conclude that it was, Spain's claim on this point fails.

### B. ABS's Handling of SafeHull Information

Spain also contends that ABS acted recklessly in its handling of information from the SafeHull modeling runs that *were* performed. Spain's (implicit) argument on this point seems straightforward: Marine Services, an ABS subsidiary, did SafeHull modeling runs on two tankers (the *Alexandros* and *Centaur*) built at the same time to the same plans as the *Prestige,* which indicated that certain aspects of the structure of those vessels were especially prone to fatigue and corrosion; yet ABS

neither caused Marine Services to use SafeHull to assess the *Prestige* itself, nor notified ABS surveyors of the results of the SafeHull assessments of the *Alexandros* and *Centaur.* This failure, according to Spain, deprived ABS surveyors of information necessary to conduct a thorough and proper evaluation of the *Prestige* in 2001 and 2002, leading to the vessel's casualty in November 2002.

This simple argument founders on a simple problem—Spain has not introduced evidence from which a reasonable jury could conclude that the *Alexandros* and the *Centaur* were in fact sufficiently similar to the *Prestige* that ABS had a tort duty to extrapolate from the results of Marine Services' SafeHull analyses in assessing the latter vessel.[12] In the district court, Spain introduced, and relied upon, excerpts from the deposition taken by Spain of Gus Bourneuf, who at the relevant times was Chief Surveyor at ABS. J.A. 737, 841–845. In the excerpt used by Spain, Bourneuf testified that ABS had concluded in the mid–1990s that, even with regard to ships with the same design and built to the same drawings, "what is found on one ship [with regard to structural fatigue] may not, in fact, be found on a sister ship," because fatigue analyses are affected by "where the ship operates, the type of cargo she is carrying, the type of trade she was in, the temperature of the water, and many other variables." J.A. 844. ABS therefore determined that SafeHull analyses would be regarded as ship-specific, rather than extrapolable to sister ships. J.A. 843–844. Spain has not disputed that these variables affect the structural fatigue actually experienced by a given vessel.

Here, Spain has not introduced evidence that the *Prestige* had a service history

**12.** ABS does not dispute Spain's assertion, *see* J.A. 737, that senior ABS personnel reviewed and assessed the reports generated by Marine Services' SafeHull analyses of the *Alexandros* and the *Centaur.*

comparable along the variables listed by Bourneuf to that of the *Alexandros* or *Centaur.* Nor could a reasonable jury conclude, on this evidentiary record, that, notwithstanding potential differences in service history, the SafeHull results as to the *Alexandros* and the *Centaur* were sufficiently probative as to the *Prestige* that ABS was *reckless* in declining, or failing, to include those results in the information regarding the *Prestige* that ABS supplied to its surveyors or to the owners of the vessel.

## C. The Gauging Report

Next, Spain suggests that decisionmakers in ABS's Houston headquarters acted recklessly in re-issuing the *Prestige's* classification certificate on May 24, 2001, after the completion of the Fifth Special Survey but prior to receiving the gauging report from that survey. As discussed above, gauging is the ultrasonic measurement of the thickness of the steel in a vessel's structure; Spain asserts that having the report explaining the findings of the gauging process "is necessary to evaluate the condition of the vessel's steel," Appellant's Br. 20. If ABS Houston had waited until its staff had the gauging report in hand, Spain asserts, the staff would have noticed the putatively glaring deficiencies in that report, been alerted to the underlying deficiencies in the gauging itself, and declined to re-issue the class certificate.

It is undisputed, however, that on May 23, 2001, prior to re-issuing the class certificate, ABS Houston received a summary of the gauging report (as well as summaries of the other survey reports) from the ABS field office in Hong Kong, which indicated that all required gaugings had been conducted and reviewed. Spain's argument, therefore, must be that ABS Houston in particular had a tort duty to conduct a substantive review of the gauging report itself prior to reissuing the class certificate, rather than leave the review to a field office, and thus that it was reckless for ABS Houston to have failed to conduct such a review in this case. But Spain has not put forward evidence from which a reasonable jury could conclude that ABS, in its Houston office, acted recklessly here.

On appeal, Spain relies on three pieces of evidence for the proposition that ABS Houston had a duty to substantively review: (1) the putative knowledge of ABS decisionmakers that "there were systemic deficiencies in the work of ABS's field surveyors"; (2) statements by ABS that it would conduct a review of the survey records of all ABS-classed vessels aged 20 years or older; and (3) a February 2000 directive by Chief Surveyor Bourneuf that copies of survey reports for tankers aged 20 years or older be sent to him personally. Appellant's Reply Br. 17.

The evidence cited for point 1, however, is the memorialization of a discussion among senior ABS surveyors, regarding quality control of field surveys, that occurred in *September* 2001. We fail to see how this could be evidence of a breach of duty by ABS in *May* 2001. Nor do we see how a reasonable jury could conclude from ABS's announcement that it would go back over past survey reports that ABS Houston in particular, rather than a regional ABS office, had a tort duty to substantively review gauging reports going *forward,* and that it was reckless in failing to do so.

Spain's argument based on the Bourneuf directive suffers from the same shortcoming. We assume *arguendo* that (a) the directive applied to the report from the 2001 Special Survey of the *Prestige;* (b) the purpose of the directive was to ensure that ABS Houston conducted a substantive evaluation of each survey report, including the full gauging report; and (c) the directive was still in force in May 2001. These propositions without more, though, certainly do not allow a reasonable jury to

conclude that in issuing the directive, Bourneuf (and through him ABS headquarters) thereby incurred a *duty* in tort substantively to review gauging reports, such that reliance on a field office's summary of the gauging report would constitute recklessness *per se.*[13]

More broadly, even if such a duty were to exist, Spain has pointed to no evidence in the record, and we are aware of none, that would shed light on the circumstances surrounding ABS Houston's putative failure to conduct such a review in this case—for example, whether the failure was due to administrative oversight, deliberate avoidance, or some other cause. That failure thus does not constitute evidence from which a fact-finder could conclude that ABS Houston's conduct was not merely a negligent failure to exercise proper care, but rather a "conscious disregard of a known or obvious risk of harm ... shar[ing] more in common with intentional torts than ... with negligence," Appellant's Br. 36.

D. The Kostazos Fax

Spain additionally suggests that ABS was reckless in disregarding a fax that was allegedly sent in August 2002 by the *Prestige's* then-master (Captain Efstratios Kostazos), alerting ABS to putatively grave mechanical and structural problems aboard the vessel, and requesting that ABS conduct an emergency inspection. The precise identity of the fax's recipient, however, in fact demonstrates a fundamental flaw in Spain's argument. Spain's the-

ory of the case here is that parent-company ABS is liable for the harms caused by the *Prestige* casualty because high-level officials in ABS disregarded the unjustifiably high risk of harm to parties such as Spain that was posed by the *Prestige. See, e.g.,* Appellant's Br. 4, 8–9, 12–20; cf. J.A. 725–726, 735–736, 741–743 (Affidavit of Brian D. Starer in Support of Spain's Motion for Determination of Choice of Law).[14] But the fax was not addressed to any of those senior executives, or indeed to anyone in ABS at all—it was addressed to ABS's *subsidiary,* Marine Services. J.A. 1390, 1401. And there is of course no evidence in the record that the fax, if and when it was received there, ever made its way from Marine Services to ABS proper, much less to ABS decisionmakers.

Spain does not contend that Marine Services (or any successor thereto) in particular was reckless in failing to respond properly itself to the fax, nor that Marine Services recklessly breached a duty to convey the fax's information to officials at ABS so that they might respond. Thus, Spain's argument must be that knowledge of the fax's contents should be *imputed* from subsidiary to parent.

On standard agency principles, such imputation would require Spain to establish both that an agency relationship existed between ABS and Marine Services *and* that the information at issue here went to matters within the scope of the agency. *See Apollo Fuel Oil v. United States,* 195 F.3d 74, 76 (2d Cir.1999) (per curiam) ("In

---

13. Spain also asserts, based on other ABS internal reports and record-keeping procedures, that "ABS headquarters was required to review [substantively] survey reports, including gaugings." Appellant's Reply Br. 16. We are skeptical that this assertion is correct; but even if it is, we again fail to see how ABS Houston's failure to comply with that requirement, on its own, creates a genuine dispute of material fact as to whether ABS Houston

*recklessly* breached a tort duty-to-review in this case.

14. While Spain's Amended Complaint names certain ABS subsidiaries as defendants in addition to the parent company, J.A. 89–90, Spain has not pointed on appeal to any tortious conduct by these subsidiary companies in particular.

general, when an agent is employed *to perform certain duties* for his principal and acquires knowledge *material to those duties,* the agent's knowledge is imputed to the principal.") (emphases added); *Mallis v. Bankers Trust Co.,* 717 F.2d 683, 689–690 (2d Cir.1983) (same); *see also* Restatement (Third) of Agency § 5.03 & cmts. b, c, e (2006) (same).

Even if we were to assume that Spain has introduced evidence sufficiently establishing that at relevant times, Marine Services (or its successor) was ABS's agent for certain purposes,[15] evidence is lacking on the crucial question whether the Kostazos fax came within the scope of Marine Services' duties as ABS's agent.

Assuming *arguendo* that Marine Services was ABS's agent with regard to Safe-Hull, for example, it is undisputed that neither the owner nor operator of the *Prestige* ever purchased a SafeHull analysis of the vessel. With respect to other services, the record contains deposition testimony that Marine Services "provide[s] certification services to marine and offshore clients as it relates to fitness for purpose or certification to design specification," J.A. 1579, and more generally that Marine Services "provides risk management and engineering support services to various third-party clients ... as it relates to their operational performance and compliance issues that they may have from a certification standpoint of various regulatory or statutory entities," J.A. 1581. Even *if* these services, at relevant times, were offered by Marine Services as an agent of

ABS, Spain has not introduced evidence that either the owner or operator of the *Prestige* was ever a client of Marine Services, such that a fax from the crew of the *Prestige* would come within the scope of Marine Services' duties on behalf of ABS. Nor is there any other evidence in the record from which a reasonable jury could conclude that information held by Marine Services regarding conditions aboard the *Prestige* should be imputed to ABS.[16] As such, even if Marine Services did receive the Kostazos fax, the failure of *ABS* to respond to the fax cannot form the basis of any liability of ABS to Spain on this record.

### E. Other Putative Evidence of Recklessness

In addition to the evidence discussed in Sections II.A–D, *supra,* the Statement of Facts of Spain's principal brief on appeal mentions three other pieces of evidence that warrant at least some discussion: the inclusion of the *Prestige* on a 1997 internal watch list of ABS-classed ships with multiple detentions by port states; the failure of ABS to heed the 1998 recommendation of one of its surveyors that the listed condition of certain of the *Prestige's* water ballast tanks be downgraded as a precaution to ensure that the tanks be examined annually; and the failure of supervisors in ABS's Dubai office to support one of its surveyors in a conflict in 2000 between the surveyor and the operators of the *Prestige* over the vessel's condition. We do not think any of this evidence is sufficient to

---

**15.** We note that an agency relationship was not created simply by virtue of Marine Services having been a wholly-owned subsidiary of ABS, *see Fletcher v. Atex, Inc.,* 68 F.3d 1451, 1461–62 (2d Cir.1995); nor has Spain introduced evidence from which a reasonable jury could conclude that ABS exercised domination over Marine Services notwithstanding the separate corporate statuses of the two companies, *cf. id.* at 1458–61.

**16.** Spain has also not introduced sufficient evidence that the fax would have served as a notification to Marine Services of conditions aboard the *Prestige, see* Restatement (Third) of Agency § 5.01(1) (2006), much less that Marine Services had actual or apparent authority to receive such a notification on behalf of ABS, *see id.* § 5.02.

create a genuine issue of material fact on recklessness, either separately or in the aggregate.

With regard to the conduct of ABS in the 2000 incident in Dubai, Spain has failed to put forward any evidence that ABS officials in the United States—as distinct from ABS Dubai and other ABS regional offices—had any involvement in the decisions that Spain now criticizes on appeal. As such, the incident, on its own, cannot create a material dispute of fact regarding recklessness by U.S. officials in this case.

Next, on the 1998 surveyor's recommendation that was not followed, we note as an initial matter that, as Spain itself says in its brief, Appellant's Br. 9–10, the recommendation concerned the *Prestige's* No. 2A water ballast tanks, rather than the No. 3 starboard cargo/ballast tank identified by Spain as the source of the casualty.[17] Regardless, we assume *arguendo* that the ultimate decision not to downgrade the condition of the tanks was made by ABS officials in the United States. Spain still has not identified any evidence going to, for example, when recommendations by line surveyors were (or were not) followed by supervisory staff; when ABS would (or would not) precautionarily alter the listed condition of a given structural element of a vessel to ensure that said element received additional survey attention; or indeed any other evidence from which a reasonable fact-finder could conclude on this record that the decision not to follow the particular recommendation at issue was reckless.

Finally, it is not clear to us how the inclusion of the *Prestige* on a watch list in 1997, standing alone, provides evidence of recklessness on the part of ABS.[18] Spain does not dispute that a notation regarding the presence of the *Prestige* on this multiple-detention list was added to the information in ABS's records regarding the *Prestige* provided to each surveyor conducting an evaluation of the vessel while that vessel was on the list, and that the notation urged extra care in surveying a vessel on the watch list. This evidence is hardly probative of a *lack* of care on the part of ABS.

Nor do we think that the pieces of evidence discussed in this section create a genuine dispute of material fact as to recklessness when taken together. Assume *arguendo* that ABS might, in certain circumstances, go above and beyond its existing survey procedures, re-evaluate its assessment of a particular vessel's condition in light of other information that complicates that assessment, and then act on that altered assessment outside the normal survey cycle. Spain fails to advance any argument, much less point to evidence in the record, as to when ABS would, or would not, have a *duty* to undertake such extraordinary action; nor do we think the information discussed in this section could implicate that duty. Certainly we do not think that a reasonable jury could conclude on the evidence presented here that the failure of ABS to take such action with regard to the *Prestige* was *reckless*.

## CONCLUSION

We appreciate the gravity of the injuries that Spain alleges it has suffered here, and

**17.** Spain argues in its reply brief that "ABS's assertion[ ] ... that the No. 2 tanks had no relationship to the No. 3 tanks ... [is] unsupported by the record and raise[s] [an] issue[ ] for the factfinder." Appellant Reply Br. 14 n. 10. But Spain itself has not pointed to any evidence in the first place that the structural soundness of the No. 2 water ballast tanks

was related to that of the No. 3 cargo/ballast tanks.

**18.** Spain adduces no evidence as to how long the *Prestige* remained on the watch list. On appeal, ABS asserts, and Spain does not contest, that the *Prestige* was not on such a list at least by the end of 2000.

do not, by our opinion, mean either to diminish those injuries or speak more broadly to the role of classification societies in maritime commerce and the potential duties of classification societies to third parties. We hold only that, on this evidentiary record, Spain has not satisfied its burden of establishing a genuine dispute of material fact as to whether ABS and its subsidiaries recklessly breached any duty that they might owe to Spain. As such, and for the foregoing reasons, the judgment of the district court is AFFIRMED.